# EXHIBIT B

EXHIBIT B

THE O'MARA LAW FIRM, P.C.
WILLIAM M. O'MARA
DAVID C. O'MARA
311 E. Liberty Street
Reno, NV 89501
Telephone: (775) 323-1321
Facsimile: (775) 323-4082

*Attorneys for Plaintiffs*

[Additional counsel appears on signature page]

REC'D & FILED

2010 DEC -3  PM 4: 06

ALAN GLOVER

BY _____ CLERK
        DEPUTY

## IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

## IN AND FOR CARSON CITY

NORMAN MILLER, Derivatively on behalf of RINO INTERNATIONAL CORPORATION,

            Plaintiff,

    v.

ZOU DEJUN, QIU JIANPING, JENNY LIU, BEN WANG, YU LI, KENNITH C. JOHNSON, QUAN XIE, LI ZEJIN, ZHANG WEIGUO, and Does 1-20 inclusive,

            Defendants,

-and-

RINO INTERNATIONAL CORPORATION,

            Nominal Defendant.

Case No.: 10 OC 00351 1B

Dept. No.: II

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

DEMAND FOR JURY TRIAL

1

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff Norman Miller, by his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") against the directors and officers of RINO International Corporation ("RINO" or the "Company") concerning wrongdoing that occurred between February 17, 2009 and November 17, 2010 (the "Relevant Period").  Plaintiff asserts state law claims for breach of fiduciary duties, waste of corporate assets and unjust enrichment against the Individual Defendants (defined herein).

2.      Plaintiff bases his allegations herein upon information and belief, except as to those allegations concerning himself, which are based upon personal knowledge.  Because Plaintiff lacks access to all information and documents on which his claims are based, certain of his allegations are made by necessity upon information and belief.  After Plaintiff has had the opportunity to conduct discovery, he will, to the extent necessary and appropriate, amend or seek leave to amend this Complaint.  Plaintiff's information and belief is derived from his counsel's investigation, which included counsel's review and analysis of the following: (i) RINO's filings with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, conference call transcripts, public statements, analyst reports, news articles and other publications by or pertaining to RINO and the Defendants named herein; and (iii) other publicly available documents.

3.      RINO, through its subsidiaries, is engaged in the business of designing, manufacturing, installing and servicing wastewater treatment and flue gas desulphurization equipment for use in China's iron and steel industry and anti-oxidation products and equipment designed for use in the manufacture of hot rolled steel plate products.

4.      RINO is essentially a shell company with very few tangible or paper assets that exists largely to fund the private variable interest expense ("VIE") business of Defendants Zou Dejun ("Zou") and Qui Jianping ("Qui").  These Defendants, as husband and wife, took RINO public through an indirect reverse merger in order to fund their private VIE – a business called Dalian RINO ("Dalian") – through public investments.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5.     In an attempt to hide this scheme, the Individual Defendants caused the Company to issue materially false and misleading statements regarding the Company's business practices, operations, and financial results.  Specifically, the Individual Defendants caused the Company to issue false and misleading filings to the SEC and press releases to the investing public that grossly inflated the Company's revenues by as much as 95%, falsely stated the Company's tax obligations and payments, and contained details regarding fabricated customer relationships that in reality did not exist.  As a result of these false statements, RINO stock traded at artificially inflated prices during the Relevant Period, reaching a high of $34.25 per share on November 30, 2009.  As a result of this inflation, RINO was able to consummate a registered direct offering of nearly 3.3 million shares of its common stock at $30.75 per share in December 2009.

6.     As a further result of these false statements, the Individual Defendants were permitted to receive shares of RINO's artificially inflated stock from an escrow-held account based on RINO's purported results.

7.     In addition to causing the publication of false and misleading statements regarding the Company's revenues, profits, tax obligations and customer relationships, the Individual Defendants also failed to comply with contractual obligations to transfer revenues from Dalian, a business privately held by Defendants Zou and Qui to RINO, and instead caused the Company to transfer its own publicly raised revenues to this privately held Company, thereby allowing the misappropriation of Company funds into the private business of Defendants Zou and Qui.

8.     The Individual Defendants also caused the Company to issue a $3.5 million "loan" to Defendants Zou and Qui on December 7, 2009, which funds they used to purchase a luxury home in Orange County, California.

9.     On November 10, 2010, Muddy Waters LLC ("Muddy Waters"), a research firm, issued an unfavorable report exposing RINO's illegal business practices, explaining that the Company is a sham that is much smaller in reality than its balance sheets and revenues would suggest, and detailing how the Company had been engaged in activities ranging from

3

1  vastly inflating revenue to fabricating customer relationships and allowing its management to
2  use company money to buy a luxury home.  Additionally, Muddy Waters reported a sizeable
3  discrepancy between the Company's revenue of $192.6 million reported in its fiscal 2009
4  Form 10-K filed with the SEC and its revenue of $11.1 million reported in its annual report for
5  fiscal 2009 filed with the China State Administration of Industry and Commerce ("SAIC").

6      10.  Following the issuance of this report, the Company's stock fell $2.34 per share
7  to close at $13.10 per share on heavy trading on November 11, 2010, a decline of 15%.

8      11.  Also on November 11, 2010, the Company issued a press release stating that it
9  had begun an internal review into the Muddy Water allegations and would timely provide a
10 detailed response to the report.  To date, no response has been made.

11     12.  Four days later, on November 15, 2010, RINO announced extremely
12 disappointing third quarter 2010 results with revenues of $52.7 million and net income of $8.8
13 million, just over half the net income reported on the prior year.  RINO also reduced its
14 revenue forecast for 2010 from $221-229 million to $203-211 million.  Even these
15 disappointing earnings results were false and misleading.

16     13.  Also on November 15, 2010, investment analyst Canaccord Genuity confirmed
17 the details of the Muddy Waters report and downgraded the Company's stock from hold to
18 sell, claiming that "RINO's business is at the least likely to be significantly smaller than its
19 reported financial statements suggest," and opining that shareholders would be unlikely at this
20 point to recover any value for the Company.

21     14.  On this news, RINO's stock collapsed further to $7.55 per share on unusually
22 heavy volume, representing a 50% decline in just one week.

23     15.  On November 16, 2010, the Company announced it was postponing its third
24 quarter conference call and did not reschedule the call.  As of December 2, 2010, the call had
25 not been rescheduled.

26     16.  On November 17, 2010, the Company filed with the SEC an amended Form 8-
27 K containing the details of a letter sent to the Individual Defendants by the Company's
28 independent auditor, Frazen Frost, LLP ("Frazen Frost").  The letter stated in part that, "[i]n a

1    telephone conversation on November 16, 2010, Mr. Zou Dejun the Chief Executive Officer of

2    the Company, informed Ms. Susan Woo of our firm, in substance, that as to the six RINO

3    customer contracts discussed in the recent report of Muddy Waters LLC, the Company did not

4    in fact enter into two of the six purported contracts . . . When Ms. Woo inquired about the

5    Company's other contracts, Mr. Zou said that he was not sure, but there might be problems

6    with 20%-40% of them."

7         17.     Following this news, the Company's stock fell another 15% to close at $6.07 on

8    November 17, 2010, after which NASDAQ halted trading of RINO stock, stating that

9    additional information was requested from the Company.  On December 2, 2010, NASDAQ

10   stated that RINO's stock would be delisted from its stock exchange based upon the following:

- The Company's announcement that its previously filed financial reports for
      fiscal 2008, 2009 and year-to-date 2010 could no longer be relied upon;

- The Company's admission that it had not entered into certain previously
      disclosed contracts; and

- The Company's failure to respond to the NASDAQ staff's request for
      additional information regarding allegations raised by the Muddy Waters,
      LLC report.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over all claims asserted herein because the claims

arise under Nevada state law and all Defendants are subject to personal jurisdiction within this

state.   RINO is a Nevada corporation with a registered corporate address at 202 South

Minnesota Street, Carson City, NV 89703.  This action is not removable to federal court.

19.     Venue is proper in this Court because some or all of the events giving rise to

Plaintiff's claims occurred and/or had effect in the Consolidated Municipality of Carson City,

the Company maintains a registered presence in Carson City, and many of the Individual

Defendants have engaged in conduct complained of herein in Carson City.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**THE PARTIES**

20.     Plaintiff Norman Miller was a shareholder of RINO stock at the time of the transaction of which the Plaintiff complains.

21.     Defendant RINO International Corporation is a Nevada corporation with its principle executive offices located at 11 Youquan Road, Zhanqian Street, Jinzhou District, Dalian, People's Republic of China 116100.  At all times relevant hereto, the Company has maintained a registered corporate office within this Judicial District at 202 South Minnesota Street, Carson City, NV 89703.

22.     Defendant Zou Dejun ("Zou") is, and at all relevant times has been, Chief Executive Officer ("CEO") and a Director of RINO.

23.     Defendant Qui Jianping ("Qui") is, and at all relevant times has been, Chairwoman of the Board of RINO.

24.     Defendant Jenny Liu ("Liu") was Chief Financial Officer ("CFO") of RINO from June 2009 through April 2010.

25.     Defendant Ben Wang ("Wang") has served as CFO of RINO since April 2010.

26.     Defendant Yu Li ("Yu") is, at and at all relevant times has been, Finance Manger of RINO.

27.     Defendant Kennith C. Johnson ("Johnson") is, and at all relevant times has been, a Director of RINO.  Throughout the Relevant Period he has been a member of the Company's Audit, Compensation and Nominating Committees.

28.     Defendant Quan Xie ("Quan") is, and at all relevant times has been, a Director of RINO.  Throughout the Relevant Period he has been a member of the Company's Audit, Compensation and Nominating Committees.

29.     Defendant Li Zejin ("Li") is a Director of RINO.  He was named to the Board of Directors on October 29, 2010, and since that time has been a member of the Company's Audit, Compensation and Nominating Committees.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

30.    Defendant Zhang Weiguo ("Zhang") was a Director of RINO from at least March 2008 to October 29, 2010.  Throughout this period he served as a member of the Company's Audit, Compensation and Nominating Committees.

31.    The Defendants referenced above in ¶¶ 22-30 are collectively referred to herein as the "Individual Defendants."

32.    The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants named in this action as Does 1-20, inclusive, are unknown to Plaintiff, who therefore sues these Defendants by fictitious names.  Plaintiff will amend this Complaint to show their true name(s) and capacities when they have been ascertained.  Plaintiff is informed and believes, and on that basis alleges, that each of these fictitiously-named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by conduct of these fictitiously-named Defendants.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.    By reason of their positions as officers, directors and/or fiduciaries of RINO, and because of their ability to control the business and corporate affairs of RINO, the Individual Defendants owed RINO and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage RINO in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of RINO and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34.    Each director and officer of the Company owes to RINO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

35.     To discharge their duties, the officers and directors of RINO were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of RINO were required to, among other things:

a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d) supervise the preparation and filing of any audits, reports, or other information required by law of the Company, and examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company, and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth herein;

e) remain informed as to how RINO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

f) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

36. In accordance with their duties of loyalty, care and good faith, the Individual Defendants, as directors and/or officers of RINO, are also obligated to refrain from:

a) participating in any transaction where the directors' or officers' loyalties are divided;

b) participating in any transaction where the directors or officers receive or are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

c) unjustly enriching themselves at the expense or to the detriment of the public shareholders.

37. Plaintiff alleges herein that the Individual Defendants, separately and together, are violating the fiduciary duties owed to Plaintiff and the other public shareholders of RINO, including their duties of loyalty, good faith and independence, insofar as they are causing the Company to falsely mislead the investing public, are engaging in self-dealing and obtaining for themselves improper personal benefits, including personal financial benefits, not shared equally by Plaintiff or the Class, and are wasting corporate assets.

38. In addition to the foregoing duties, those Individual Defendants who are members of the Audit Committee of the Board have been assigned certain additional responsibilities by the Board. These additional duties are delineated in the charter of the Audit Committee and include, among others things, that the Committee:

- Oversee the corporate accounting and financial reporting process and the internal and external audits of the financial statements of RINO;

- Help the Board fulfill its oversight responsibilities to the stockholders and the investment community relating to the Company's financial statements and financial reporting process;

- Review audit results and annual and interim financial statements and discuss the audited financial statements with both the Company's outside auditors and the Company's management prior to any public filing of those reports; and

- Oversee the Company's procedures for preparing published annual statements and management commentaries.

9

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

39.    The conduct of the Individual Defendants complained of herein involves a violation of their obligations as directors and officers of RINO, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company and its shareholders.

40.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of RINO, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with RINO, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least February 17, 2009 and continuing thereafter.  During this time, the Individual Defendants caused the Company to conceal the true facts as alleged herein.

42.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects so the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

43.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its business prospects and release improper statements.  Because the actions described herein occurred at the direction of the Company's financial management team and under the authority of the Board, each of the Individual Defendants was a direct,

1   necessary and substantial participant in the conspiracy, common enterprise and/or common
2   course of conduct complained of herein.

3      44.    Each of the Individual Defendants aided and abetted and rendered substantial
4   assistance in the wrongs complained of herein. In taking such actions to substantially assist
5   the commission of the wrongdoing complained of herein, each Individual Defendant acted
6   with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that
7   wrongdoing, and was aware of his or her overall contribution to and furtherance of the
8   wrongdoing.

9      45.    At all times relevant hereto, each of the Individual Defendants was the agent of
10  each of the other Individual Defendants and of RINO, and was at all times acting within the
11  course and scope of such agency.

## FACTUAL ALLEGATIONS

### *Background*

14     46.    RINO, through its subsidiaries, operates as an environmental protection and
15  remediation company in the People's Republic of China. The Company engages in designing,
16  manufacturing, installing and servicing wastewater treatment and flue gas desulphurization
17  ("FGD") equipment primarily for use in the iron and steel industry and anti-oxidation products
18  and equipment for use in the manufacture of hot rolled steel plate products. Its products
19  include the Lamella Inclined Tube Settler Waste Water Treatment System, which comprise
20  industrial water treatment equipment, effluent-condensing equipment sets, solid and liquid
21  abstraction dewatering equipment, and coal gas dust removal and cleaning equipment; the
22  Circulating Fluidized Bed, FGD System that removes particulate sulphur from flue gas
23  emissions generated by the sintering process in the production of iron and steel; and the High-
24  Temperature Anti-Oxidation System for hot rolled steel, a set of products and a mechanized
25  system that reduces oxidation-related output losses in the production of continuous cast hot
26  rolled steel. In addition, the Company offers contract machining services for third-party
27  industrial enterprises.

28

11

47.     RINO became a publicly traded corporation through a reverse merger with a shell company called Applied Biometrics.  RINO operates through its subsidiary Innomind Group Limited, a British Virgin Islands corporation, and a variable interest entity ("VIE") called Dalian RINO. Dalian RINO is owned by Defendants Zou and Qui – the husband and wife founders of RINO.

48.     Pursuant to an agreement dated October 5, 2007, 5,580,000 shares of RINO common stock beneficially owned by Defendants Zou and Qui were deposited into an escrow account in order to secure RINO's obligation under the Securities Purchase Agreement and Make Good Escrow Agreement, dated October 5, 2007, among the Company and certain investors, pursuant to which RINO was required to deliver to such investors the shares in the escrow account in the event the Company failed to achieve certain after-tax income targets.

49.     As demonstrated below, the Individual Defendants were motivated to, and in fact did, report favorable financial results so as to receive these millions of shares of RINO stock held in escrow, even though these favorable financial results were false and misleading.

### The Individual Defendants Cause the Company to Issue False and Misleading Statements

50.     Throughout the Relevant Period, the Individual Defendants caused RINO to issue false and misleading statements through SEC filings and press releases regarding the Company's financial condition, including the Company's total assets, total revenues and projected revenues.  The Individual Defendants also caused the Company to issue false and misleading statements regarding the Company's share of the FGD market, its total number of FGD customers, and the Company's tax obligations in both the U.S. and China.

51.     On February 17, 2009, RINO issued a press release reporting its expected fourth quarter and year-end 2008 earnings results.  Additionally, RINO announced its fiscal year 2009 guidance, indicating projected revenue would exceed $176 million in 2009. Defendant Zou stated in part that "we expect 2009 revenues for waste water treatment, desulphurization and anti-oxidation revenues to grow by approximately 50%, 10%, and 300%, respectively, compared with 2008 while maintaining a similar margin profile."

52.    On May 15, 2009, RINO issued a press release reporting its first quarter 2009 earnings results.   The Company reported net income of $12.5 million, or $0.50 diluted earnings per share ("EPS"), and revenue of $35.6 million for the quarter ending March 31, 2009.

53.    On August 10, 2009, RINO issued a press release reporting its second quarter 2009 earnings results.  The Company reported net income of $9.9 million, or $.0.39 diluted EPS, and revenue of $40.7 million for the quarter ending June 30, 2009.

54.    On November 13, 2009, RINO issued a press release reporting its third quarter 2009 earnings reslts.  The Company reported net income of $19.7 million, or $0.78 per diluted EPS, and revenue of $63.3 million for the quarter ending September 30, 2009.

55.    On March 31, 2010, RINO filed its Form 10-K for its fourth quarter and fiscal year 2009.  The Company reported net income of $13.5 million, or $0.53 diluted EPS, and record revenue of $53.0 million for the fourth quarter of 2009.  The Company further reported net income of $56.4 million, or $2.26 diluted EPS, and revenue of $192.6 million for the year ended December 31, 2009.

56.    The financial statements in ¶¶ 51-55 were materially false and misleading because they reported net income and revenues that were grossly overstated.  The Individual Defendants knew and/or were reckless in not knowing that these statements were false at the time that they caused the Company to publish them.   These statements were false and misleading because they were based on false revenue reported from customer contracts that did not exist.  The Individual Defendants knew and/or were reckless in not knowing that throughout 2009 a significant number of the Company's customer relationships were fabricated and the revenues reported from these relationships did not exist.  As one analyst remarked on November 10, 2010, the Company's fiscal year 2009 results were overstated by as much as 95%.

57.    On May 17, 2010, RINO issued a press release reporting its first quarter 2010 financial results.  The Company reported net income of $8.5 million, or $0.30 diluted EPS, and revenue of $47.9 million for the quarter ended March 31, 2010.

58.   On August 16, 2010, RINO issued a press release reporting its second quarter 2010 financial results. The Company reported net income of $15.5 million, or $0.54 diluted EPS, and revenue of $65.4 million for the quarter ended June 30, 2010.

59.   The financial statements in ¶¶ 57-58 were materially false and misleading because they reported net income and revenues that were grossly overstated. The Individual Defendants knew and/or were reckless in not knowing that these statements were false at the time that they caused the Company to publish them. These statements were false and misleading because they were based on false revenue reported from customer contracts that did not exist. The Individual Defendants knew and/or were reckless in not knowing that throughout 2010 a significant number of the Company's customer relationships were fabricated and the revenues reported from these relationships did not exist.

60.   In addition to causing the Company to issue false and misleading revenue reports throughout the Relevant Period, the Individual Defendants also caused the Company to significantly overstate its FGD market share and technological capabilities, further misleading the investing public. For example, in its 2009 Form 10-K, RINO lists Yuhua Steel Co. Limited ("Yuhua"), Chongqing Iron & Steel ("Chongqing") and Nanchang Changli Iron & Steel ("Changli") as significant customers of their FGD systems. However, an investigation conducted by Muddy Waters relying on publicly available information and individual interviews with company officials showed that these statements were false and the that customer relationships were fabricated, because none of the companies had ever purchased an FGD system from RINO.

61.   Similarly, RINO's March 2010 Investor Presentation to public shareholders contained false and misleading information about the Company's FGD customer list and market penetration. In particular, this presentation stated that Yueyufeng Steel Group ("Yueyufeng") and Lai Steel Group ("Lai") were significant customers who had purchased RINO's FGD systems. However, Muddy Waters confirmed in interviews with executives from each company that these statements were false. Neither company had ever purchased an FGD system nor any other product from RINO.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

62.     The Individual Defendants also caused the Company to issue false and misleading statements regarding RINO's technological capabilities and market penetration relative to its FGD competitors.  In its 2009 Form 10-K the Company reported that it was the only company producing FGD systems for steel sinters, and that it had a "two to three year-lead" over potential competitors.  However, this statement was false, because eight months previously Long King, a major competitor, had announced it had completed one of the largest steel sinter FGD projects in the world.   Indeed, a study conducted by the Chinese government's Ministry of Information and Industry Technology found that over 35 steel sinter FGD systems had been installed by the end of 2009, with RINO having been involved in only a few of them.

63.     The Individual Defendants knew and/or were reckless in not knowing that these statements were materially false and misleading when they caused the Company to make them.  By deliberately misleading investors, including Plaintiff and the other members of the Class (defined herein), the Individual Defendants breached their fiduciary duties to the public shareholders of RINO.

### *The Individual Defendants Engage in Self-Dealing*

64.     Throughout the Relevant Period, the Individual Defendants have engaged in a complex and massive scheme of self-dealing by misappropriating funds from the Company and diverting them into private personal and business interests.

65.     Based on the strength of the Company's false financial earnings throughout 2009, on December 7, 2009 RINO completed its definitive agreements with several institutional investors for a registered direct offering of nearly 3.3 million shares of common stock to raise capital of approximately $100 million.  The Company reported proceeds of this transaction would be used for working capital requirements.

66.     However, on the very same day, Defendants Zou and Qui, the husband and wife co-founders of RINO, caused the Company to issue them a $3.5 million "loan."  Two days later, on December 9, 2009, Defendants Zou and Qui purchased a $3.2 million luxury home in Orange County, California.  This loan was not reported to the Company's public shareholders

1   until March 30, 2010, and at no point was the personal nature of the loan disclosed to the
2   Company's public shareholders.

3       67.     While Defendants Zou and Qui brazenly and unjustly enriched themselves by
4   purchasing a luxury home with Company money, their self-dealing scheme to drain the
5   Company coffers and divert shareholder money to their private business has been far more
6   damaging to RINO.  Defendants Zou and Qui took RINO public in 2007, but did so through a
7   reverse merger in which RINO did not own the operating company, but rather a shell company
8   located in China called Innomind.  Innomind in turn entered into a series of contracts with the
9   operating company, Dalian, which Defendants Zou and Qui own entirely in private as a VIE.
10  In these contracts, Zou and Qui promised to pay to Innomind on a monthly basis whatever
11  pretax profit the VIE generates.  By paying all of the VIE's profits to Innomind – a company
12  owned entirely by RINO – Zou and Qui contracted in essence to fund RINO through whatever
13  profits their private operating company generated.

14      68.     Unfortunately, although VIE's balance sheets demonstrate that VIE has
15  generated substantial profit since 2007, Defendants Zou and Qui have not made a single
16  payment to RINO.  On the contrary, VIE's balance sheet dated June 30, 2010 shows that a
17  $156.5 million payment due to RINO was cancelled.  Even worse, however, is that Zou and
18  Qui are causing money to flow the wrong way – from RINO into VIE.  According to RINO's
19  2009 Form 10-K, approximately $40 million in raised funds have been paid into Innomind, yet
20  according to SAIC financial documents, Innomind is nearly devoid of cash or any tangible
21  assets.  Alarmingly, shortly after the $40 million dollars was paid into Innomind, VIE received
22  a $36.5 million payment from Innomind.  As Muddy Waters put it in its November 10, 2010
23  report on RINO, *"Innomind is lending money to VIE, which is highly improper and*
24  *alarming because it would mean that VIE is actually taking money directly from RINO's*
25  *shareholders."*

26      69.     Defendants Zou and Qui, through their self-dealing, have clearly and
27  irreparably harmed the Company's public shareholders and placed their own personal interests
28  ahead of those to whom they owe fiduciary duties, unjustly enriching themselves in the

1  process.   Similarly, as members of the Audit and Nominating Committees, Defendants

2  Johnson, Xie and Weiguo owed the Company's public shareholders fiduciary duties to prevent

3  such massive and wanton misappropriation of funds and unjust enrichment.   By allowing

4  nearly $40 million to be drained from RINO and into Zou and Qui's privately held business,

5  the Individual Defendants have breached their fiduciary duties and engaged in corporate waste.

6  *__Research Analysts Expose the Company's Culture of Financial Mismanagement, Grossly__*
7  *__False and Misleading Statements, and Illegal Misappropriation of Company Assets__*

8       70.    On November 10, 2010, Muddy Waters, a Hong Kong investment firm

9  specializing in the analysis of Chinese corporations, issued a scathing report about RINO,

10  claiming that the Company is little more than a sham that has been engaging in activities

11  ranging from vastly inflating revenue and fabricating customer relationships to lying about the

12  Company's tax obligations and allowing management to misappropriate Company funds to

13  buy a luxury home in Orange County, California.   Muddy Waters summarized the major

14  claims in the report thusly:

15
·    RINO claims to be the leader in selling desulphurization ("FGD") and other
16    environmental equipment to Chinese steel mills.  It reported 2009 revenue of
      $193 million.  In reality its revenue is under $15 million, and its management
17    has diverted tens of millions of dollars for its own use.  We value RINO based
      on the cash we believe remains in the Company after the most recent raise.

18    •     RINO's FGD sales (60% to 75% of revenue) are much lower
19          than it claims.  We found that many of its customer relationships
            do not exist.

20
21    •     Chinese regulatory findings show that RINO's consolidated
            2009 revenue was only $11 million, or 94.2% lower than it
22          reported in the U.S.  We show that the Chinese numbers are
            credible.

23
24    •     RINO's accounting has serious flaws that are clear signs of
            cooked books.

25
26    •     RINO's management is draining cash from the Company for its
            own business and personal uses.  The management is in flagrant
27          breach of its VIE agreements, which require it to pay income to
            RINO (as opposed to taking it).

28

- RINO's balance sheet has an astonishingly small amount of tangible assets for a manufacturer. Rather, it is filled with low quality "paper" assets that balance out the inflated earnings, and likely hide leakage.

- RINO is not the industry leader it claims to be in the steel sinter FGD system market. Rather, it is an obscure company in a crowded field, and is best known for its failed projects. Its reported margins are two to three times what they really are. Its technology is sub-par.

- We are not sanguine about management "borrowing" $3.5 million to purchase a luxury home in Orange County, CA the day that RINO closed its $100.0 million financing.

71. This report was confirmed by other analysts in the days after its release. Market analyst Canaccord Genuity downgraded its stock investment rating on RINO from hold to sell on November 15, 2010, saying the "Muddy Waters allegations are difficult to dismiss and RINO's real business is at the least likely to be significantly smaller than its reported financial statements suggest."

72. As demonstrated below, the Muddy Waters report exposed at RINO a culture of corruption, misappropriation of funds, accounting irregularities, misstatement of revenues, and falsification of customer relationships in an attempt to artificially inflate the Company's stock price and benefit themselves to the detriment of the public shareholders.

*RINO Significantly Misstates its Revenues*

73. Muddy Waters analyzed the Company's 2009 Form 10-K, which reported fiscal year revenues of $192.6 million, and the Company's 2009 SAIC filing, which reported fiscal revenues of $11.1 million. It concluded that the SAIC filing was largely correct, but that the SEC filing contained significant (and sometimes obvious) errors. For example, the $192.6 million revenue number relied largely on customer contracts that could not be verified (and later turned out to be fabricated), a large number of "paper" assets that appeared to be fraudulent, and an implausibly high advances for inventory to raw materials ratio, creating inflated asset holdings and justifying the falsely inflated reported revenues.

18
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

74.   Given the nearly 95% overstatement of the Company's revenues and the draining of Company assets into Defendant Zou and Qui's private company, Muddy Waters concluded that "RINO's actual consolidated revenue (including VIE) is less than $15 million annually. . . RINO's actual profitability is marginal at best." Muddy Waters further warned that "RINO is worth approximately $70 million ($2.45 per share), and falling. . . RINO is a shell company with at most $70 million in cash (raised, not generated) and recently acquired assets."

*RINO Falsifies Customer Contracts and Overstates Its FGD Market Share*

75.   Much of the reason RINO's revenues were overstated by nearly 95% stemmed from the Individual Defendants' deliberate falsification of the Company's FGD customer contracts. The Muddy Waters report explained that "RINO has fabricated FGD customer relationships, and therefore significantly overstated revenue. . . . Because FGD historically represents approximately 60%-75% of RINO's reported revenue, these fabrications show that RINO is significantly overstating its revenue."

76.   In particular, Muddy Waters "spoke with knowledgeable people at nine of RINO's purported customers. *Five of the nine deny having purchased FGD systems from RINO.* It is likely that RINO fabricated a sixth customer relationship."

77.   In addition to fabricating customer relationships, RINO has also misled the public regarding its market share in the FGD industry, its technological performance, and its overall FGD capabilities. After conducting extensive industry research, Muddy Waters concluded that "[t]here are dozens of Chinese companies (possibly over 50) vying to produce FGD systems for steel sinters," and that "RINO is an obscure player in the steel sinter FGD system industry." While producers quickly named a number of FGD industry leaders in interviews (most notably Long King, the industry leader with $172 million in desulfurization revenue in 2009), few named or had even heard of RINO.

78.   Contrary to the facts, however, RINO has consistently overstated its market share and technological capabilities. For example, RINO stated in its 2009 Form 10-K dated March 31, 2010 that "it is the only company producing FGD systems for steel sinters, and that

1  it has a two to three year lead over potential competitors."  However, eight months earlier

2  Long King had announced that it completed one of the largest steel sinter FGD projects in the

3  world.  Moreover, approximately 35 steel sinter FGD systems had been installed by the end of

4  2009, directly contradicting the Company's statements in its 2009 Form 10-K.

5       79.   RINO's overstatements regarding its FGD market share is reflected in its

6  "comical" reported gross margins in FGD systems.  As Muddy Waters observed, "RINO

7  historically claims 35% - 40% gross margins on its FGD systems.  This is out of line with the

8  industry.  Most producers generate 10% - 15% gross margins [and industry leader] Long King

9  recently reached 20% in the first half of 2010."  Muddy Waters continued: "Were RINO to

10  have really generated the $116.4 million in steel sinter FGD sales it claims for 2009, it is

11  improbable that it would have such a low profile among its competitors.  (It likely would have

12  been far and away the highest profile and most successful company in the industry.)"

13       80.   Indeed, to the extent that RINO has a reputation in the industry, it appears to be

14  a poor one.  For example, of the three customers with whom Muddy Waters spoke that

15  confirmed they had purchased FGD systems from RINO, significant performance issues with

16  at least one (and possibly two) of those systems required the customers to seek out alternative

17  manufacturing options:

18       •   Panzhihua Iron & Steel confirmed that RINO had built an FGD

19           sysem for its smallest (180m2) sinter, but that the system did not
             perform to expectations.  Our contact stated, "We are not

20           satisfied with the technology because the desulfurization rate is
             lower than what we want."  It is unlikely to engage RINO in the

21           future.

22       •   Jinan Iron & Steel Group confirmed that RINO built an FGD

23           system in 2005.  Our contact would not comment on the report
             that Jinan took the system offline because it was not performing

24           well. . . . An employee from fabricated client Lai Steel Group
             stated "I've heard that the sinter built by RINO in Jinan has

25           stopped running.  Their technology has no advantage beside not
             producing wastewater."

26

27       81.   Similarly, the International Financial Research & Analysis Group conducted a

28  study on FGD system technology and found a number of specific issues with RINO's

1    technology, including low sulfur reduction rate, high operating cost, higher than advertised

2    upfront investment costs, and poor operational history.  As one industry leader stated in the

3    report, "Baosteel has NEVER used RINO's CFB method in any of its FGD projects and is

4    very unlikely to use it in the future due to [significant] problems in their technology."

5                                       *RINO's "Cooked Books"*

6          82.     In addition to repeatedly significantly misstating the Company's revenues and

7    the Company's FGD customer list, the Individual Defendants have repeatedly caused the

8    Company to engage in accounting irregularities designed to disguise RINO's comparatively

9    weak financial condition.  These accounting irregularities include, among others: RINO's

10    misstated value added tax ("VAT") payment disclosures to the SEC, its claimed income tax

11    obligations in China, and its misstated balance sheets regarding asset ownership.

12          83.     As RINO's 2009 Form 10-K explains, RINO pays VAT of 17% on its sales in

13    China, which subjects almost all sales of goods to VAT.  However, as Muddy Waters observed

14    in its report, "RINO's disclosures of the [VAT] it pays greatly contradict its reported revenues:

15      *The inconsistency between VAT and reported revenues highlights the*

16      *accounting strains resulting from significantly cooking the books.*  It may also
      disguise leakage from the Company.  RINO discloses in the notes to its

17      financial statements the VAT it supposedly paid.  The VAT it pays implies that
      RINO revenues are significantly greater that what it actually reports.  However,

18      the body of evidence does not suggest that RINO's reporting is conservative.
      Rather, RINO is overstating its revenue.  In the PRC, almost all sales of goods

19      are subject to VAT.  As RINO explains, it pays VAT of 17% on its sales.  By
      dividing the VAT amounts from the notes by 17%, we arrived at the implied

20      sales numbers.  The implied sales are significantly greater than reported sales
      quarter after quarter.

21          84.     In addition to "cooking the books" on its VAT reporting, Muddy Waters found

22    that the Company also has significantly misled the public in its SEC filings regarding its

23    income tax obligations.  RINO's 2008 and 2009 Forms 10-K report that RINO had no income

24    tax expense, which directly contradicts both U.S. and Chinese tax law.  As Muddy Waters

25    noted, "RINO should have paid income taxes of at least 15% in 2008 and 2009," which would

26    have lowered the Company's reported profits.  This provides yet another example of the

27    Individual Defendants causing the Company to engage in significant accounting irregularities

28    in order to artificially inflate profits, and in turn, the Company's stock price.

85.   In addition to misstating its tax obligations, the Company has repeatedly submitted entirely implausible balance sheets that include "an astonishingly small amount of tangible assets for a manufacturer.  Rather, it is filled with low quality 'paper' assets that balance out the inflated earnings," likely hide misappropriation of funds, and may not even be owned in reality by RINO.

86.   As Muddy Waters reported, "the amount of 'paper assets on RINO's Balance Sheet is implausible for its business:

> For RINO, the problem with balance sheets is that they need to balance.  As RINO manufactures profits that inflate the equity side of the balance sheet, it needs to show corresponding increases in assets. . . . Buying forged paper is obviously less costly than investing in tangible assets.

> RINO manufactures custom products in production times measured in months, with the main input being steel.  It is a slow moving, asset and labor-intensive production process. Yet, quarter in and quarter out, RINO's tangible operating assets are a small percentage of its overall operating assets. . . .

> [In other words,] RINO's raw material balances have not grown in line with sales.  Raw materials are one of the best – if not the best – ways of gauging a manufacturer's output. . . . We observe that even the 2007 raw materials balance seems quite low for a company that generated $42.1 million dollars through a slow moving, asset and labor-intensive production process making custom built products.  Common sense dictates that a factory such as this could not run a just in time system.   The 2007 number becomes even more implausible in 2009.   In contrast, Long King and Fei Da [two industry competitors] generated 2008 and 2009 sales no more than 21x raw materials (versus RINO's 2009 figure of 760x).

In short, the Individual Defendants' lies regarding the Company's revenues and profits during the Relevant Period had to be balanced out by more lies regarding the Company's assets.

87.   In addition to inflating the Company's assets to justify its false revenues and profits derived from non-existent customer contracts, the Individual Defendants appear also to have artificially inflated the Company's "paper" assets to cover up misappropriation of company funds.  In RINO's 2009 Form 10-K, the Company's balance sheet lists advances for inventory 138 times the size of the Company's raw materials assets.  The advance for inventory are "far too many times the raw material balance to be taking seriously," because it indicates that for each day's worth of raw materials RINO keeps on hand, it has "effectively

22

prepaid for 138 to 355 days' worth of raw materials." Obviously, RINO would never agree to such onerous terms.   As demonstrated below, the only other plausible explanation is misappropriation of funds under the guise of inventory advances.

*The Individual Defendants Use Company Assets for Personal Use*

88.   Muddy Waters reported further that Defendants Zou and Qui – the husband and wife founders of RINO, have repeatedly drained the Company's coffers to finance their own private business and for the purchase of personal items, including a $3.5 million estate in Orange County, California.

89.   Muddy Waters explained that Defendants Zou and Qui have repeatedly violated their contractual obligations to RINO by failing to pay money into RINO from their privately held VIE, Dalian. Although the VIE's balance sheets demonstrate that the VIE has generated substantial profit since 2007, Defendants Zou and Qui have not made a single payment to RINO. On the contrary, the VIE's balance sheet dated June 30, 2010 shows that a $156.5 million payment due to RINO was cancelled. Even worse, however, is that Zou and Qui are causing money to flow the wrong way – from RINO into the VIE. As Muddy Waters observed, this amounts to stealing money directly from the shareholders:

> Because RINO does not own VIE, it has agreements with VIE designed to transfer money and value to RINO. Beyond not honoring those agreements, the management is causing money to flow the wrong way – into VIE. Innomind is lending money to VIE, which is highly improper and alarming because it would mean that *VIE is actually taking money directly from RINO's shareholders*. . . . The money that went into Innomind [and then to VIE] came directly from RINO's equity raises.

90.   However, Defendants Zou and Qui have not only misappropriated Company funds for their business ventures, but they also have drained the Company coffers for their own personal use.   On December 7, 2009, the same day RINO closed on a $100 million financing deal, Defendants Zou and Qui borrowed "approximately $3.5 million" from the Company.   Two days later they purchased a $3.2 million home in Orange County, CA.   The Company did not disclose this loan until March 31, 2010 in its Form 10-K, and this disclosure did not explain that Zou and Qui used the money to buy a personal home.   While RINO claims that Zou and Qui repaid the loan on May 10, 2010, the Company never formally disclosed –

1  either before or after making the loan – that the money was used by the CEO and his wife for

2  personal reasons.  This misappropriation of funds, in addition to being illegal under both U.S.

3  and Chinese law, is symbolic of the wanton disrespect the Individual Defendants have for the

4  Company's shareholders; appropriating Company funds for blatantly personal use and failing

5  to adequately disclose the nature of the loan is a slap in the face to RINO's public

6  shareholders, and further demonstrates the Individual Defendants breaches of their fiduciary

7  duties.

8  ### *The Company Begins to Come Clean About its True Financial Condition*

9       91.    On November 11, 2010, one day after the release of the Muddy Waters report,

10  RINO issued a press release in which it stated it had "launched an internal review of Muddy

11  Waters' allegations" and promised to "provid[e] investors with a timely and detailed response

12  to the allegations upon completion of its internal review."  In an incredibly troubling sign for

13  the Company and its public shareholders, RINO has yet to provide the promised detailed

14  response.  However, the Company's November 15, 2010 third quarter earnings release and

15  November 17, 2010 Form 8-K filed with the SEC reflect belated attempts to come clean about

16  the true state of the Company.

17       92.    On November 15, 2010, the Company announced extremely disappointing third

18  quarter 2010 results, marking the first time that RINO's quarterly or year-end earnings results

19  reflect the true state of affairs rather than artificially inflated revenues.  Among the highlights

20  in the press release were the following disappointing statements:

21      •   Total revenues in the third quarter of 2010 were $52.7 million, a

22         16.7% decrease from the corresponding period in 2009.

23      •   Operating profit in the third quarter of 2010 was $9.9 million, a

24         49.3% decrease for the corresponding period in 2009.

25      •   Net income in the third quarter of 2010 was $8.8 million, a

26         48.3% decrease from the corresponding period in 2009.  Net income excluding a change in fair value of warrants (non-GAAP) was $8.7 million, a 55.6% decrease from the

27         corresponding period in 2009.

28

- Diluted earnings per share ("EPS") for the third quarter of 2010 was $0.31. Diluted EPS excluding change in fair value of warrants (non-GAAP) was $0.31, a 60.8% decrease from $0.78 for the corresponding period in 2009.

- Cash and cash equivalents as of September 30, 2010 were $56.1 million, representing a decrease of 58.3% as compared to $134.5 million as of December 31, 2009.

- Accounts receivable stood at $112.0 million, a 93.8% increase from $57.8 million reported as of December 31, 2009.

In addition, the Company significantly revised downward its outlook for fiscal year 2010, from a previously estimated range of $221-229 million to a range of $203-211 million.

93.     Two days later, on November 17, 2010, the Individual Defendants caused the Company to file an amended Form 8-K with the SEC. Section 4.02 was entitled "Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review." In this section Frazer Frost, LLP, the independent auditors of RINO, disclosed the contents of a telephone conversation between Ms. Susan Woo of Frazer Frost and Defendant Zou. In that conversation Defendant Zou admitted that, "as to six RINO customer contracts discussed in the recent report of Muddy Waters LLC, *the Company did not in fact enter into two of the six purported contracts*." When asked about all of the Company's other contracts, Defendant Zou said that "*there might be problems with 20% - 40% of them.*"

94.     This astonishing admission that the Company had lied about having entered into at least two customer contracts and that the same might be true for up to 40% of the Company's entire customer portfolio led Frazer Frost to state in the amended 8-K that the audit reports from December 31, 2008 to December 31, 2009 and the quarterly financial statements from March 31, 2008 to September 30, 2010 "should no longer be relied upon."

95.     These admissions by Defendant Zou prove the truth of the claims about RINO contained in the Muddy Waters report, namely that: a) the Individual Defendants caused the Company to falsify customer contracts and report revenue on these false contracts; b) the Individual Defendants used these falsely reported revenues to artificially inflate RINO's total

1    revenues and profits; and c) the Individual Defendants used these falsely inflated revenues and

2    profits to artificially inflate the Company's stock price and unjustly enrich themselves, to the

3    detriment of the Company's public shareholders.

### *Millions of Dollars of Shareholder Value are Destroyed*

5        96.    On November 9, 2010, the day before the Muddy Waters report was released,

6    RINO's publicly traded stock closed at $15.25 per share, representing a market capitalization

7    of approximately $436 million.

8        97.    Following the release of the Muddy Waters report on November 10, 2010, the

9    Company's disappointing third quarter earnings press release on November 15, 2010, the

10   Company's indefinite postponement of its third quarter conference call on November 16,

11   2010, and the filing of its amended 8-K confirming the fabrication of customer contracts on

12   November 17, 2010, RINO's stock tumbled to a close of $6.07.  In the span of one week,

13   nearly *$263 million of RINO's shareholder value was destroyed.*

14       98.    After the market closed on November 17, 2010, NASDAQ halted trading of

15   RINO stock while it awaited additional information from the Company regarding the Muddy

16   Waters report.  However, the Individual Defendants never provided this information.  On

17   December 2, 2010, NASDAQ stated that it was delisting RINO's stock from its exchange.

### DAMAGES TO THE COMPANY

19       99.    As a result of the Individual Defendants' improprieties, RINO disseminated

20   improper statements concerning its revenues, profits, and customer contracts as alleged herein.

21   In addition, as a result of the Individual Defendants' Relevant Period improprieties, the

22   Company is now the subject of class action lawsuits that allege violations of the federal

23   securities laws and state common law.

24       100.   As a direct and proximate result of the Individual Defendants' actions as

25   alleged above, RINO's market capitalization has been substantially damaged and RINO's

26   value to the Company's public shareholders or to any third party bidder in the context of a sale

27   of the Company has been severely diminished.

28

101.    Further, as a direct and proximate result of Individual Defendants' actions, RINO has expended and will continue to expend significant sums of money that it otherwise would not have had to.  Such expenditures include, but are not limited to:

a)  Costs incurred in investigating and defending RINO and certain officers in the class actions, plus potentially millions of dollars in settlements or adverse judgments;

b)  Costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on RINO's artificially-inflated stock price and inflated revenues; and

c)  Costs incurred from the loss of the Company's customers' confidence in RINO's services.

102.    As a result of the Individual Defendants' misconduct, RINO's corporate image and goodwill have been irreparably damaged.  RINO's Board has misled the investing public, such that RINO's ability to raise equity capital or debt on favorable terms in the future is now impaired.

103.    As a result of the Individual Defendants' improprieties, RINO disseminated improper public statements concerning its financial outlook and business prospects as alleged above.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104.    In accordance with Nevada Rule of Civil Procedure 23.1, Plaintiff brings this action derivatively in the right and for the benefit of RINO to redress injuries suffered, and to be suffered, by RINO as a direct result of the breaches of fiduciary duty, as well as the aiding and abetting thereof, waste of corporate assets and unjust enrichment by the Individual Defendants.  RINO is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

105.    Plaintiff will adequately and fairly represent the interests of RINO in enforcing and prosecuting its rights.

106.    Plaintiff has continuously held the stock of RINO during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

107.    The current Board of RINO consists of the following individuals: Defendants Zou, Qui, Johnson, Xie and Li.  Plaintiff has not made any demand on the present Board of RINO to institute this action because such a demand would be a futile, wasteful and useless act. Demand is futile for a combination reasons articulated herein.

108.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein through lofty compensation, prestige and equity awards.

109.    The Individual Defendants of RINO, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from RINO's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

110.    The Company concedes that Defendants Zou and Qui are not independent because of the substantial compensation each receives through employment at the Company, and by virtue of their status as co-founders of the Company.  The Company admits that Defendants Zou and Qui are not independent on the Company's website and in the Company's 2009 Form 10-K.

111.    The Company's Statement on Corporate Governance dictates the roles of the Board, which are, among other things:

- Monitor overall corporate performance, the integrity of the Company's financial controls and the effectiveness of its legal compliance programs;

- Oversee management;

- Review and adopt the Company's long-term strategic direction and approve specific objectives;

- Ensure that necessary resources are available to pursue the strategies and achieve objectives; and

- Develop with management broad strategies for enhancing shareholder value.

112. The Individual Defendants failed to properly fill any of the above roles. Accordingly, each Individual Defendant breached his or her fiduciary duties of due care, loyalty, and good faith when the Company issued statements and earnings press releases that contained false and/or misleading material information. Particularly, each Individual Defendant failed to properly ensure: (i) the Company's revenues, profits, and corporate performance was adequate; (ii) that the Company's stated customer relationships actually existed; (iii) that the Company's long-term direction was proper; and (ii) that none of the Company's money or assets were improperly misappropriated. Thus, each Individual Defendant faces a sufficiently substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

113. Defendants Johnson, Xie and Li were, during the Relevant Period, members of the Audit Committee. The Audit Committee's charter charges the Audit Committee with overseeing the Company's accounting and financial reporting process, reviewing the Company's audited results and annual and interim financial statements, and discussing these statements prior to filing them with the SEC. Thus, the Audit Committee was expressly responsible for overseeing and directly participating in the dissemination of RINO's earnings press releases. Accordingly, Defendants Johnson, Xie and Li breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee participated in the preparation of improper statements and earnings press releases that contained false and/or misleading material information. Particularly, these Defendants reviewed and failed to correct RINO's improper earnings press releases described above. Thus, Johnson, Xie and Li face a sufficiently substantial likelihood of liability for their breach of fiduciary duties making any demand upon them futile.

114.   Defendants Johnson, Xie and Li were, during the Relevant Period, members of the Nominating Committee.  The Nominating Committee's charter charges the Nominating Committee with, among other things: (i) monitoring and making recommendations regarding Board functions, contributions and composition; and (ii) developing the criteria and qualifications for membership of the Board.   Thus, the Nominating Committee was responsible for overseeing and directing RINO's inadequate Board action over the Relevant Period.  Accordingly, Defendants Johnson, Xie and Li breached their fiduciary duties of due care, loyalty, and good faith because the Nominating Committee knew about the greatly exaggerated revenues and profits, fabricated customer relationships, and misappropriation of Company funds, and either knowingly participated in the preparation of improper statements and earnings press releases that contained false and/or misleading material information or knowingly ignored such improper statements the Individual Defendants caused the Company to make.  Thus, Defendants Johnson, Xie and Li face a sufficiently substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

115.   Because the members of the Compensation Committee – Defendants Johnson, Xie and Li – singularly control the other Defendants' awards, the other members of the Board will not institute this action against them.   To do so would jeopardize each Defendant's personal financial compensation.  Thus, demand on Defendants Zou and Qui is futile.

116.   Defendants Zou and Qui are married.   This personal relationship clearly demonstrates that they will not sue each other and cannot be expected to exercise independent business judgment with respect to initiating claims against one another.  Moreover, Defendants Johnson, Xie and Li serve together on various Company committees, and have formed close professional relationships over that time.  Accordingly, they cannot be expected to exercise objective business judgment in bringing suit against one another.  In order to bring this suit, all of the directors of RINO would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

117. The acts complained of constitute violations of the fiduciary duties owed by RINO's officers and directors and these acts are incapable of ratification.

118. Each of the Individual Defendants of RINO authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

119. Any suit by the current directors of RINO to remedy these wrongs would likely expose the Individual Defendants and RINO to violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

120. RINO has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for RINO any part of the damages RINO suffered and will suffer thereby.

121. If RINO's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of RINO. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by RINO against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of RINO, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On

31

1   the other hand, if the suit is brought derivatively, as this action is brought, such insurance

2   coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no

3   directors' and officers' liability insurance at all then the current directors will not cause RINO

4   to sue them, since they will face a large uninsured liability.

5          122.   Moreover, despite the Individual Defendants having knowledge of the claims

6   and causes of action raised by Plaintiff, the current Board has failed and refused to seek to

7   recover for RINO for any of the wrongdoing alleged by plaintiff herein.

8          123.   A true and correct copy of the Complaint was delivered to RINO before its

9   filing with this Court.

10                                   **FIRST CAUSE OF ACTION**

11   **Derivative Claim Against All Individual Defendants for Breach of Fiduciary Duty**

12          124.   Plaintiff incorporates by reference and realleges each and every allegation

13   contained above, as though fully set forth herein.

14          125.   The Individual Defendants owed and owe RINO fiduciary obligations.  By

15   reason of their fiduciary relationships, the Individual Defendants owed and owe RINO the

16   highest obligation of good faith, fair dealing, loyalty and due care.

17          126.   The Individual Defendants, and each of them, violated and breached their

18   fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

19          127.   Each of the Individual Defendants had actual or constructive knowledge that

20   they had caused the Company to improperly misrepresent the business prospects, operations

21   and revenues of the Company and failed to correct the Company's publicly reported financial

22   guidance.  These actions were not a good faith exercise of prudent business judgment to

23   protect and promote the Company's corporate interests.

24          128.   As a direct and proximate result of the Individual Defendants' failure to

25   perform their fiduciary obligations, RINO has sustained significant damages.  As a result of

26   the misconduct alleged herein, the Individual Defendants are liable to the Company.

27          129.   Additionally, by their actions alleged herein, the Individual Defendants, either

28   directly or through aiding and abetting, abandoned and abdicated their responsibilities and

32

1  fiduciary duties with regard to prudently managing the assets and business of RINO in a
2  manner consistent with the operations of a publicly held corporation.

3      130.   As a direct and proximate result of the Individual Defendants' mismanagement
4  and breaches of duty alleged herein, RINO has sustained significant damages in excess of
5  hundreds of millions of dollars.  As a result of the misconduct and breaches of duty alleged
6  herein, the Individual Defendants are liable to the Company.

7      131.   Plaintiff on behalf of RINO has no adequate remedy at law.

8                    **SECOND CAUSE OF ACTION**

9  **Derivative Claim Against All Individual Defendants for Waste of Corporate Assets**

10     132.   Plaintiff incorporates by reference and realleges each and every allegation
11  contained above, as though fully set forth herein.

12     133.   Plaintiff alleges this cause of action on behalf of the Company against all of the
13  Individual Defendants.

14     134.   Each of the Individual Defendants owes and owed to the Company the
15  obligation to protect its assets from loss or waste.

16     135.   As specified above, by any objective assessment, the Individual Defendants'
17  failure to properly oversee the business and operations of the Company, including their
18  deliberate actions to misappropriate and/or their failure to prevent the misappropriation of
19  millions of dollars of Company assets into the private business of Defendants Zou and Qui and
20  into the purchase of a private luxury home for Defendants Zou and Qui resulted in the waste of
21  corporate assets.

22     136.   By reason of the foregoing, the Company has sustained and will continue to
23  sustain serious damage and irreparable injury, for which relief is sought herein.

24     137.   Plaintiff on behalf of RINO has no adequate remedy at law.

25                    **THIRD CAUSE OF ACTION**

26  **Derivative Claim Against All Individual Defendants for Unjust Enrichment**

27     138.   Plaintiff incorporates by reference and realleges each and every allegation
28  contained above, as though fully set forth herein.

139.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of RINO, including by wrongfully receiving RINO stock at an artificially inflated price from the Company's escrow account, wrongfully appropriating Company funds into the private business of Defendants Zou and Qui, and misappropriating funds into the purchase of a luxury home for Defendants Zou and Qui.

140.   Plaintiff, as a shareholder and representative of RINO, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

141.   Plaintiff on behalf of RINO has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that this action is properly maintainable as a class action;

B. Declaring and decreeing that the Individual Defendants are in breach of the fiduciary duties owed to RINO's public shareholders;

C. Declaring and decreeing that the Individual Defendants have wasted corporate assets;

D. Declaring and decreeing that the Individual Defendants have unjustly enriched themselves;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

///
///
///
///
///
///
///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

## JURY DEMAND

2      Plaintiff demands a trial by jury.

3 Respectfully submitted,

4

5 Dated: December 3, 2010.

THE O'MARA LAW FIRM, P.C.
WILLIAM M. O'MARA
6                    DAVID C. O'MARA

7

8                 DAVID C. O'MARA, ESQ.

9                 THE O'MARA LAW FIRM, P.C.
WILLIAM M. O'MARA
10                DAVID C. O'MARA

11                311 E. Liberty Street
Reno, NV 89501
12                Telephone: (775) 323-1321
Facsimile: (775) 323-4082

13

14

15

16                JOHNSON BOTTINI, LLP
FRANCIS A. BOTTINI, JR.
SHAWN E. FIELDS
17

18                501 West Broadway, Suite 1720
San Diego, California 9201
19                Telephone: (619) 230-0063
Facsimile: (619 238-0622

20

21                *Attorneys for Plaintiff*

22

23

24

25

26

27

28

1

## AFFIRMATION
(Pursuant to NRS 239B.030)

2

3          The undersigned does hereby affirm that the preceding document filed in the

4    above referenced matter.

5    __X__          Document does not contain the social security number of any person

6                                      -OR-

7    ___          Document contains the social security number of a person as required by:

8          ____ A specific state or federal law, to wit:

9

10                                   -or-

          ____ For the administration of a public program

11

12                                   -or-

          ____ For an application for a federal or state grant

13

14                                   -or-

          ____ Confidential Family Court Information Sheet (NRS 125.130, NRS

15          125.230 and NRS 125B.055)

16    DATED:  December 3, 2010.

17                                         THE O'MARA LAW FIRM, P.C.

18

19                                         DAVID C. O'MARA, ESQ.

20

21

22

23

24

25

26

27

28

—————————————————————————————————————
                              36



## VERIFICATION

I, Norman Miller, hereby verify that I am a shareholder of RINO International Corporation ("RINO"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct.  I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.  Having received a copy of this Verified Shareholder Derivative Complaint, having reviewed it with counsel, I hereby authorize its filing.

Date: 12/3/10

Mr. Norman Miller