# EXHIBIT D

# EXHIBIT D

THE O'MARA LAW FIRM, P.C.
WILLIAM M. O'MARA
DAVID C. O'MARA
311 E. Liberty Street
Reno, NV 89501
Telephone: (775) 323-1321
Facsimile: (775) 323-4082

*Attorneys for Plaintiffs*

[Additional counsel appears on signature page]

REC'D & FILED

2011 AUG -3 PM 12: 00

ALAN GLOVER

BY J. HARKLEROAD
          DEPUTY

# IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

## IN AND FOR CARSON CITY

| | |
|---|---|
| IN RE RINO INTERNATIONAL CORP. DERIVATIVE ACTION | Case No.:   10-OC-005291 B |
| ------------------------------------------- | Dept No. 1 |
| THIS DOCUMENT RELATES TO: | (Related to 10-OC-005511 B) (Derivative Action) |
| ALL ACTIONS | **VERIFIED FIRST AMENDED CONSOLIDATED DERIVATIVE COMPLAINT** |

1

Plaintiffs Elliot F. Dworkin, Norman Miller, and Richard Elipani, shareholders of nominal defendant RINO International Corporation ("RINO" or the "Company"), a Nevada corporation, bring this shareholder derivative action, pursuant to Rule 23.1, Nev. R. Civ. P., based on personal knowledge concerning allegations about themselves, and as to all other allegations, on information and belief, based on their counsel's investigation, which included: a review and analysis of RINO's filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, conference call transcripts, public statements, analyst reports, news articles, and other publicly available documents. Plaintiffs believe their allegations will have further evidentiary support after a reasonable opportunity to conduct discovery.

## I.   NATURE AND SUMMARY OF THE ACTION

1.      Plaintiffs bring this action against current and former officers and directors of RINO for wrongs committed by them against the Company during the period January 1, 2008 to the present (the "Relevant Period").  Plaintiffs assert claims against them under Nevada law on behalf of the Company for breach of fiduciary duty, waste of corporate assets, and unjust enrichment.

2.      RINO is a public holding company incorporated in Nevada and headquartered in the People's Republic of China.  RINO is an environmental remediation company. Through subsidiaries, RINO manufactures equipment that removes sulphur particles from toxic gases given off during the production of iron and steel – gases that create acid rain. This developing industry in China is important to the country's modernization and competitiveness.  RINO has publicly characterized itself as a large and important player in this industry.  RINO's stock – once traded on NASDAQ – climbed to a high of $34.25 per share on November 30, 2009, enabling RINO to consummate a registered direct offering of nearly 3.3 million shares at $30.75 per share in December 2009.

2

3.      RINO's current and former officers and directors, however, have been less than honest with the public about the Company's financial results, contracts with customers, business prospects, and standing within the remediation industry.

4.      On November 10. 2010, RINO was accused of serious wrongdoing and financial fraud in a factually detailed research report prepared by a firm of financial analysts in Hong Kong, Muddy Waters, LLC ("Muddy Waters").  The Muddy Waters research report flatly contradicted RINO's reported high annual revenues and low tax liabilities, and even questioned the authenticity of RINO's customer contracts. The report pointed to blatant and illegal self-dealing and disloyalty by the Company's founders and majority owners, defendants Zou Dejun and Qui Jianping, husband and wife.

5.      On November 11, 2010, RINO's stock fell sharply on news of the adverse Muddy Waters report.  The stock price fell $2.34 per share, or nearly 15%, and closed at $13.10 that day on heavy trading volume. Shortly after the Muddy Waters report was issued, several securities fraud class actions were filed, naming the Company and its officers as defendants. RINO later announced that it is also the subject of a formal SEC investigation into the Company's financial reporting and compliance with the Foreign Corrupt Practices Act.

6.      In substance, the Muddy Waters report concluded that RINO was a much smaller company than its balance sheets and revenues suggested.  The report detailed how RINO had vastly inflated its revenue, fabricated customer contracts, and given its founders – defendants Zou Dejun and Qui Jianping   a $3.5 million unsecured, interest-free "loan" with which to buy themselves a luxury home in California.  The Muddy Waters report identified a material discrepancy between the Company's U.S. stated revenue of $192.6 million reported in its fiscal 2009 Form 10-K filed with the SEC, and Company revenue of only $11.1 million that RINO reported in its annual report for fiscal 2009 filed in China with the China State Administration of Industry and Commerce ("SAIC").

7.      The Company eventually corroborated the material allegations of the Muddy Waters report. On November 11. 2010, the Company issued a press release stating that it had begun an internal review into the Muddy Water allegations and would timely provide a

1   detailed response to the report.  Nevertheless, to date, the Company has made no direct
2   response to it.

3       8.      Four days later, on November 15, 2010, RINO announced extremely
4   disappointing third quarter 2010 results, with revenues of $52.7 million and net income of $8.8
5   million, just over half the net income RINO had reported in the prior year.  RINO also slashed
6   its revenue forecast for 2010 from $221-229 million to $203-211 million.  But even these
7   disappointing earnings results were false and misleading, as investors were soon to learn. On
8   this news, RINO's stock price collapsed further to $7.55 per share on unusually heavy volume,
9   representing a 50% decline in just one week.

10      9.      On November 16, 2010, the Company postponed its third quarter conference
11  call and did not reschedule the call.

12      10.     On November 17, 2010, the Company filed an amended Form 8-K with the
13  SEC containing the text of a letter from the Company's independent auditor, Frazer Frost, LLP
14  ("Frazer Frost").  The letter stated in part that, "[i]n a telephone conversation on November 16,
15  2010, Mr. Zou Dejun the Chief Executive Officer of the Company, informed Ms. Susan Woo
16  of our firm, in substance, that as to the six RINO customer contracts discussed in the recent
17  report of Muddy Waters LLC, the Company did not in fact enter into two of the six purported
18  contracts . . . When Ms. Woo inquired about the Company's other contracts, Mr. Zou said that
19  he was not sure, but there might be problems with 20%-40% of them."

20      11.     The Company's stock fell another 15% on this disclosure, closing at $6.07 on
21  November 17, 2010.  The NASDAQ halted trading of RINO stock after the close of trading on
22  November 17, 2010, explaining that it had requested from the Company additional information
23  about the issues raised in the Muddy Waters report.  RINO's officers and directors, however,
24  have never provided this information to NASDAQ.

25      12.     Based on Zou Dejun's statements to the Company's outside auditor, Frazer
26  Frost, on November 19, 2010, the Company filed another Form 8-K warning that investors
27  should no longer rely on the *past three years* of the Company's publicly-issued financial
28  statements. The Board of Directors concluded that RINO's previously issued audited financial

4

statements for 2008 and 2009 -- included in RINO's annual reports on Form 10-K for those years -- *plus* its unaudited financial statements included in all of its Company's quarterly reports on Form 10-Q for the periods March 31, 2008 to September 30, 2009 and March 31, 2010 to September 30, 2010, "**should no longer be relied on ....**" (RINO Form 8-K, filed 11/19/10)(emphasis added).

13.    On December 2, 2010, the Company disclosed in a Form 8-K filing that NASDAQ had told the Company in writing that it's stock would be delisted from NASDAQ. RINO listed the following reasons given by NASDAQ for the delisting: (a) the Company's announcement that its previously filed financial reports for fiscal 2008, 2009 and year-to-date 2010 could no longer be relied upon; (b) the Company's admission that it had not entered into certain previously disclosed contracts; and (c) the Company's failure to respond to the NASDAQ staff's request for additional information regarding allegations raised by the Muddy Waters. LLC report.

14.    In its Form 8-K filing on December 2, 2010, RINO disclosed that it intended to file restated financials for the fiscal years ended December 31, 2008 and 2009, and for the quarterly periods March 31, 2008 to September 30, 2010. The Company also disclosed the SEC's formal investigation into "the Company's financial reporting and compliance with the Foreign Corrupt Practices Act for the period January 1, 2008 through the present."

15.    Trading in the Company's stock was halted from the close of trading on November 17, 2010 to December 8, 2010. After that, trading continued but only in the "pink sheets." The Company's stock closed at $3.15 on December 8, 2010 on heavy volume and has declined to its current price of about $1.65 per share.

16.    Moreover, RINO recently disclosed that it is currently the subject of a formal investigation by the SEC regarding the Company's financial reporting and compliance with the Foreign Corrupt Practices Act ("FCPA"). This marks the first published instance in which a wholly China-based company has been the target of an FCPA investigation.

17.    Following these shocking disclosures, RINO announced that it would conduct an investigation into the wrongdoing. Its audit committee retained an outside law firm and a

1  forensic accounting firm to investigate the fraud.  The outside lawyers and accountants

2  reported their results to the Audit Committee and to Defendants Dejun and Jianping.  But

3  apparently Defendants Dejun and Jianping did not like the results, which on information and

4  belief including findings that Dejun and Jianping committed fraud and/or engaged in disloyal

5  conduct.  As a result, the Company's independent directors all resigned on or about March 31,

6  2011, as did the outside lawyers and forensic accountants.

7       18.  On April 11, 2011, in response to these resignations and the failure of the

8  Company to disclose the results of the investigation conducted by the Audit Committee with

9  the help of outside lawyers and forensic accountants, the SEC suspended trading in RINO

10  stock and issued the following announcement:

11         "It appears to the Securities and Exchange Commission that there is a lack of current

12  and accurate information concerning the securities of RINO International Corporation, because the company has failed to disclose that: (i) The outside law firm and forensic

13  accountants hired by the audit committee to investigate allegations of financial fraud at the company resigned on or about March 31, 2011, after reporting the results of their

14  investigation to management and the board; (ii) the chairman of its audit committee resigned on March 31, 2011; and (iii) the company's remaining independent directors

15  have also resigned. Further, questions have arisen regarding, among other things: (i) The size of the company's operations and number of employees; (ii) the existence of

16  certain material customer contracts; and (iii) the existence of two separate and

17  materially different sets of corporate books and accounts. RINO is a Nevada corporation with its headquarters and operations in the People's Republic of China,

18  which trades on OTC Link under the symbol "RINO."

19         "The Commission is of the opinion that the public interest and the protection of

20  investors require a suspension of trading in the securities of the above-listed company.

21         "Therefore, it is ordered, pursuant to Section 12(k) of the Securities Exchange Act of

22  1934, that trading in the above-listed company is suspended for the period from 9:30 a.m. EDT, April 11, 2011, through 11:59 p.m. EDT, on April 25, 2011.

23         "By the Commission.

24

25         "Elizabeth M. Murphy,

26         "Secretary."

27

28

19.    Pre-suit demand on the Board is plainly futile. As of the date of the filing of this Verified First Amended Consolidated Shareholder Complaint, there are only two current directors of RINO -- Zou Dejun and his wife Qui Jianping -- who together own over 60% of the Company's stock and have been using the Company as their personal piggy bank, with no resistance from the Board. The Company's own SEC filings state that Zou Dejun and Qui Jianping lack independence.   And no more compelling proof could exist of the lack of independence of Dejun and Jianping than the resignation of the supposedly independent members of the board when Dejun and Jianping refused to take action against themselves and others when confronted with the results of the Audit Committee's investigation in early 2011.

20.    The Board allowed Zou Dejun and Qui Jianping to borrow $3.5 million in an unsecured, interest-free loan at the Company's expense. The transaction was illegal under U.S. and Chinese law, yet the Board did not even disclose the loan until many months afterward.

21.    Zou Dejun and Qui Jianping also failed to transfer revenues from their company. Dalian Rino (defined and discussed below) to RINO, as required by contract. Instead, the Company transferred its own publicly raised revenues to Dalian Rino, allowing Zou Dejun and Qui Jianping to misappropriate Company funds.

22.    During the Relevant Time Period, the Board was plainly dominated and controlled by Zou Dejun and Qui Jianping; and now the Board consists solely of Dejun and Jianping, and demand is therefore clearly futile. A majority of the Board allowed the Company to record artificially inflated revenues for nearly three years. This revenue was even based on customer contracts that RINO now admits were a total fiction. The Board allowed this financial statement fraud to go on for so long because of their own disloyalty and because the artificial inflation suited the desires of RINO's majority owners, Zou Dejun and Qui Jianping. As discussed below, the Company's inflated financial results allowed Zou Dejun and Qui Jianping to retain thousands of shares of their Company stock that they otherwise would have had to distribute under contract to certain private investors in the Company if the Company failed to meet certain revenue and earnings goals.   The Company must now restate its

financials for every quarter going back to the first quarter of 2008. Pre-suit demand would have been futile, and is thus excused.

## II.   JURISDICTION AND VENUE

23.   This Court has subject matter jurisdiction because plaintiffs' claims arise under Nevada state law. RINO is incorporated under Nevada law and maintains a registered corporate address at 202 South Minnesota Street, Carson City, NV 89703. This action is not removable to federal court.

24.   Venue is proper in this District because some or all of the events giving rise to plaintiffs' claims occurred or had an effect in the Consolidated Municipality of Carson City, the Company maintains a registered presence in Carson City, and some of the Individual Defendants have engaged in the wrongful conduct alleged in this complain in this District.

## II.   THE PARTIES

25.   Plaintiffs Elliot F. Dworkin, Norman Miller, and Richard Elipani are current shareholders of RINO stock and have held the stock throughout the duration of the wrongdoing alleged herein and continue to hold it.

26.   Nominal defendant RINO is a Nevada corporation. Its principal executive offices are located at 11 Youquan Road, Zhanqian Street, Jinzhou District, Dalian, People's Republic of China 116100.  At all times relevant hereto, the Company has maintained a registered corporate office within this Judicial District at 202 South Minnesota Street, Carson City, NV 89703.

27.   Defendant Zou Dejun is, and at all relevant times has been, Chief Executive Officer ("CEO") and a Director of RINO.

28.   Defendant Qui Jianping is, and at all relevant times has been, Chairwoman of the Board of RINO.

29.   Defendant Jenny Liu was Chief Financial Officer of RINO from June 2009 through April 2010.

30.   Defendant Ben Wang has served as CFO of RINO since April 2010.

31.     Defendant Yu Li is, at and at all relevant times has been, Finance Manager of RINO.

32.     Defendant Kennith C. Johnson was a Director of RINO during the Relevant Time Period up until his resignation on or about March 31, 2011.  Until his resignation, Kennith Johnson was a member of the Company's Audit, Compensation and Nominating Committees.

33.     Defendant Quan Xie was a Director of RINO during the Relevant Time Period up until his resignation on or about March 31, 2011.  Until his resignation, Quan Xie was a member of the Company's Audit, Compensation and Nominating Committees.

34.     Defendant Zhang Weiguo was a Director of RINO from at least March 2008 to October 29, 2010, during which Zhang Weiguo served as a member of the Company's Audit, Compensation and Nominating Committees.

35.     Defendant Bruce Richardson was RINO's Secretary and Chief Financial Officer from October 2007 until September 2008, when he resigned.

36.     The individuals named above in ¶¶27-35 are referred to in this complaint as the "Individual Defendants."

37.     Defendants Moore Stephens Wurth Frazer and Torbet, LLP and Frazer Frost, LLP are accounting firms and served as RINO's accountants during Relevant Time Period. Frazer Frost LLP is the successor entity of Moore Stephens Wurth Frazer and Torbet LLP. Moore Stephens Wurth Frazer and Torbet LLP audited RINO's 2008 year-end financial results. Frazer Frost LLP audited RINO's 2009 year-end financial results.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

38.     The Individual Defendants owe RINO and its shareholders the fiduciary duties of trust, loyalty, good faith and due care. They were obliged to use their utmost ability to control and manage RINO in a fair, just, honest and equitable way.  As officers or directors of RINO, the Individual Defendants had the ability to control the Company.

39.     The Individual Defendants were required to exercise good faith and diligence in the administration of the affairs of the Company and to preserve its property and assets. They

owed the Company and its shareholders the highest obligations of fair dealing and to refrain from acting in their own self-interest at the expense of the Company and its shareholders. In addition, the Individual Defendants had a duty to promptly disseminate accurate and truthful information about the Company's revenue, contracts, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

40.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a) ensure the Company's compliance with its legal obligations, by, among other things, disseminating truthful and accurate financial reports and statements to the SEC and the investing public, and properly guiding investors and analysts about the Company's true financial condition;

b) conduct the affairs of the Company in an efficient, business-like manner to provide the highest quality performance of its businesses, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c) maintain adequate internal accounting controls as required by generally accepted accounting principles ("GAAP"), ensure that the Company's financial statements were based on accurate financial information, make and keep books, records, and accounts which accurately reflected the Company's transactions, devise and maintain a system of internal financial accounting controls to provide reasonable assurances that transactions are executed in accordance with management's authorization and that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP;

d) supervise the preparation and filing of any audits, reports, or other information required by law of the Company, and review and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company, and make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth herein; and

e) remain informed and current about RINO's operations, and, upon notice or information of imprudent or unsound conditions or

practices, make reasonable inquiry into them, take action to correct such conditions or practices, and disclose material facts to the public to comply with federal and state securities laws.

41.     The Individual Defendants' fiduciary duties of loyalty, care, and good faith also obligated them to refrain from participating in a transaction that would: (a) divide their loyalties; (b) allow them to receive a personal financial benefit not equally shared by the Company's public shareholders; and (c) unjustly enrich them at the Company's or the shareholders' expense.

42.     The Audit Committee members have added responsibilities that are set out in the Audit Committee's charter. These responsibilities include, among others things, that the Committee:

- Oversee the corporate accounting and financial reporting process and internal and external audits of the financial statements of RINO;

- Help the Board fulfill its oversight responsibilities to the stockholders and the investment community concerning the Company's financial statements and financial reporting process;

- Review audit results and annual and interim financial statements and discuss the audited financial statements with both the Company's outside auditors and the Company's management before publicly filing those reports; and

- Oversee the Company's procedures for preparing published annual statements and management commentaries.

43.     The Individual Defendants were also required to abide by RINO's Code of Ethics for its employees and directors. The Company's Code of Ethics required employees and directors to "promptly report" any prohibited or unlawful act to the Chief Financial Officer. With respect to "Financial and Accounting Officers and Managers," RINO's Code of Ethics, among other things, required financial and accounting managers to "prohibit and eliminate the occurrence of conflicts between ... the best interests of the [Company] and [the personal interests of] a member of the financial organization, including Financial and Accounting Officers and Managers," and to ensure that "[b]usiness transactions are properly

11

1    authorized and completely and accurately recorded on the Company's books and records in

2    accordance with .... [GAAP] and established company financial policy."

3         44.    The Individual Defendants violated their obligations as directors and officers of

4    RINO, and knew or should have known that their faithless conduct posed a risk of serious

5    injury to the Company and its shareholders.

6         45.    Because of their positions of control and authority as directors and/or officers

7    of RINO, the Individual Defendants exercised control over the wrongful acts complained of

8    herein and the false financials and public statements discussed in detail below. Because of

9    their advisory, executive, managerial, and directorial positions with RINO, each of the

10   Individual Defendants had knowledge of material non-public information regarding the

11   Company.

12   V.    **SUBSTANTIVE ALLEGATIONS**

13         A.    **Background and genesis of the Company**

14         46.    RINO came into being only after many contorted permutations, capped by a

15   reverse takeover – the hallmark of a recent string of Chinese corporate frauds on U.S.

16   investors.

17         47.    The Company's genesis begins in 1984 when it was incorporated in Minnesota

18   as Applied Biometrics, Inc., a company formed to develop and market a cardiac output

19   monitoring system. (Form S-1/A-2, filed with the SEC on 4/7/08, at 8). In August 2000, the

20   Applied Biometrics Board determined that the Company would be unable to complete the

21   development of its primary product, and ceased its business operations. (*Id.*). In connection

22   with terminating those business operations, in August 2000, the Company's chief executive

23   officer resigned, all employees were laid off and all but two of the Company's directors

24   resigned. During the latter part of 2000, the Company wound down its operations, eliminated

25   most of its expenses, and negotiated the termination or satisfaction of all of the Company's

26   obligations. (*Id.*).

27         48.    On May 14, 2002, the Company filed a Form 15 with the SEC and ceased being

28   a reporting company under the Securities Exchange Act of 1934. (*Id.*)

49.     As a special meeting held on August 4, 2005, the Company's shareholders adopted a plan of complete liquidation and dissolution of the Company (the "Plan"). After that shareholder vote, but before the Company's remaining funds were distributed, on October 20, 2005, Glenn A. Little ("Little") contacted the Company and proposed a reorganization that consisted of: (i) revoking the Plan; (ii) Little lending $100,000 to the Company (the "Loan") pursuant to a convertible promissory note (the "Convertible Note"); (iii) a one-time distribution of all of the Company's assets (including $75,000 of the Loan proceeds) to all of the Company's shareholders other than Little; and (iv) amending the Company's Articles of Incorporation to increase the authorized capital in order to permit the conversion of the Convertible Note.   At a special shareholders' meeting held on February 8, 2006, Little's proposal was approved, and the Convertible Note was subsequently converted to 10,000,000 (5,000 post-split) shares of the common stock. As a result, Little became the Company's majority shareholder with 64.1% of the issued and outstanding shares. (*Id.*).

50.     In January 2007 the Company (still named Applied Biometrics) merged with and into its wholly-owned subsidiary, Jade Mountain Corporation (a Nevada corporation), thereby changed its domicile from Minnesota to Nevada, and changed its name to Jade Mountain Corporation.   (*Id.*).   This action was taken pursuant to a shareholder meeting on October 18, 2006. (*Id.*).

51.     On June 5, 2007, by written consent of the holder of a majority of the outstanding shares of the Company's stock, the shareholders authorized a 1-for-200,000 reverse stock split, which was effectuated on July 16, 2007. (*Id.*)

52.     On August 31, 2007, the Company's Board of Directors authorized an amendment to its Articles of Incorporation to: (i) increase the number of its authorized shares of common stock from 100,000,000 shares, par value $.0001 per share, to 10,000,000,000 shares, par value $.0001 per share (the "Authorized Share Increase"); and (ii) forward split its issued and outstanding common stock on a 100-for-1 basis (the "Forward Split"). Under Nevada law, neither the Authorized Share Increase nor the Forward Split required the approval of the Company's shareholders. (*Id.*).

53.     In a share exchange transaction signed on October 3, 2007 and closed on October 5, 2007 (the "Share Exchange"), the Company acquired Innomind Group Limited ("Innomind"), and through that acquisition also acquired Innomind's wholly-owned subsidiary, Dalian Innomind, as well as the assets and the business of Dalian Innomind's PRC affiliate, Dalian Rino Environment Engineering Science and Technology Co., Ltd. ("Dalian Rino"). In the Share Exchange, the Company issued 17,899,643 shares of common stock (the "Control Shares") to Zhang Ze, Innomind's sole shareholder and the nephew of defendants Zou Dejun and Qui Jianping, in exchange for 10 shares of capital stock of Innomind, which represented all of the issued and outstanding shares of Innomind, which were owned by Zhang Ze. (Id.).

54.     As a result of the Share Exchange, Dalian Innomind assumed management of the business activities of Dalian Rino, making Dalian Rino a controlled affiliate of Dalian Innomind, and Innomind a wholly-owned subsidiary of Dalian Rino. (Id. at 10).

55.     Simultaneously with the consummation of the Share Exchange, Zhang Ze transferred and conveyed all of the Control Shares (and all of his right, title and interest in and to the Control Shares) to The Innomind Trust, of which defendants Zou Dejun and Qiu Jianping, the founders and sole equity owners of Dalian Rino, are the beneficiaries. (Id.). The Control Shares represent 71.5% of RINO's total outstanding common stock as of December 31, 2008.    According to the Company's 2009 Annual Report filed on March 31, 2010, defendants Zou Dejun and Qiu Jianping own and control over 65% or 17.9 million of 28.6 million shares of the Company's common stock.

56.     On October 5, 2007, the Company sold 5,464,357 shares of its common stock in a private placement under a Securities Purchase Agreement, raising $24,480,319. (Form S-1/A-2, filed with the SEC on 4/7/08, at 11). The Securities Purchase Agreement provided that 5,580,000 shares of Company stock beneficially owned by defendants Zou Dejun and Qiu Jianping, through The Innomind Trust, would be held in escrow to secure the Company's obligation under the Securities Purchase Agreement to deliver additional common stock to the private placement investors if the Company failed to achieve certain financial performance

targets for fiscal years 2007 and 2008 (the "Make Good Escrow Shares"). If the Company failed to achieve these financial targets during fiscal 2007 to 2008, it was obligated to release and distribute the Make Good Escrow Shares to the Private Placement Investors – taking them away, in effect, from defendants Zou Dejun and Qui Jianping.

57.     The acquisition of Innomind and Dalian Innomind on October 5, 2007 by Jade Mountain Corporation effected a change in control and was accounted for as "reverse acquisition." (Form S-1/A-2, filed with the SEC on 4/7/08, at 10). On May 9, 2008, Jade Mountain Corporation changed its name to "RINO International Corporation."

58.     This contorted reverse merger method of bringing wholly China-based companies onto U.S. stock exchanges is now being investigated by the SEC:

One of China's least-noticed exports to the U.S. has been hundreds of Chinese companies that slipped onto U.S. stock exchanges through back-door mergers with dormant shell companies.

Many of these small, high-growth companies, including industrial companies RINO International Corp. . . . have minimal revenues, questionable accounting and inscrutable corporate governance.

Now that back door may be starting to close. The Securities and Exchange Commission has begun a crackdown on the practices of the "reverse takeover" market for Chinese listings, according to people with knowledge of the probe. Specifically, the SEC's enforcement and corporate-finance divisions have begun a wide-scale investigation into how networks of U.S. accountants, lawyers, and bankers have helped bring scores of Chinese companies onto the U.S. stock markets, these people say.

The Wall Street Journal, "Congress and SEC Hit Stocks Made in China," Dec. 20, 2010.

**B.     The business RINO does in China through its subsidiaries**

59.     RINO is a holding company for its subsidiaries, through which RINO states that it operates as an environmental protection and remediation company in the People's Republic of China. According to the Company, it designs, manufactures, installs and services wastewater treatment and flue gas desulphurization ("FGD") equipment primarily for use in the iron and steel industry in China and anti-oxidation products, and equipment for use in the manufacture of hot rolled steel plate products.

60.     RINO's products include: (a) the Lamella Inclined Tube Settler Waste Water Treatment System, which comprise industrial water treatment equipment, effluent-condensing equipment sets, solid and liquid abstraction dewatering equipment, and coal gas dust removal and cleaning equipment; (b) the Circulating Fluidized Bed, FGD System that removes particulate sulphur from flue gas emissions generated by the sintering process in the production of iron and steel; and (c) the High-Temperature Anti-Oxidation System for hot rolled steel, a set of products and a mechanized system that reduces oxidation-related output losses in the production of continuous cast hot rolled steel. In addition, the Company offers contract machining services for third-party industrial enterprises.

61.     RINO operates through its subsidiary Innomind and Dalian Rino, a variable interest entity ("VIE"), an entity which holds financial assets, usually for a specified purpose. (Financial Accounting Standards Board Interpretation No. 46). Dalian Rino, as alleged above, is owned by Defendants Zou Dejun and Qui Jianping.

62.     Pursuant to the Securities Purchase Agreement and Make Good Escrow Agreement, 5,580,000 shares of RINO common stock beneficially owned by Defendants Zou Dejun and Qui Jianping were to be delivered to the private placement investors in the event the Company failed to achieve certain after-tax income targets. As alleged below, the Individual Defendants falsely reported favorable financial results to avoid having to issue these shares to the private placement investors.

C.     **Hong Kong analyst, Muddy Waters, exposes RINO's fraud**

63.     On November 10, 2010, Muddy Waters, a Hong Kong investment firm that analyzes Chinese corporations, claimed in a research report that RINO had been inflating revenue, fabricating customer relationships, lying about its tax obligations, and allowing its top executives to use Company funds illegally to buy a luxury home in Orange County, California. The Muddy Waters' reported stated in part:

> ∘     RINO claims to be the leader in selling desulphurization ("FGD") and other environmental equipment to Chinese steel mills. It reported 2009 revenue of $193 million. In reality its revenue is

16

under $15 million, and its management has diverted tens of millions of dollars for its own use. We value RINO based on the cash we believe remains in the Company after the most recent raise.

• RINO's FGD sales (60% to 75% of revenue) are much lower than it claims. We found that many of its customer relationships do not exist.

• Chinese regulatory findings show that RINO's consolidated 2009 revenue was only $11 million, or 94.2% lower than it reported in the U.S. We show that the Chinese numbers are credible.

• RINO's accounting has serious flaws that are clear signs of cooked books.

• RINO's management is draining cash from the Company for its own business and personal uses. The management is in flagrant breach of its VIE agreements, which require it to pay income to RINO (as opposed to taking it).

• RINO's balance sheet has an astonishingly small amount of tangible assets for a manufacturer. Rather, it is filled with low quality "paper" assets that balance out the inflated earnings, and likely hide leakage.

• RINO is not the industry leader it claims to be in the steel sinter FGD system market. Rather, it is an obscure company in a crowded field, and is best known for its failed projects. Its reported margins are two to three times what they really are. Its technology is sub-par.

• We are not sanguine about management "borrowing" $3.5 million to purchase a luxury home in Orange County, CA the day that RINO closed its $100.0 million financing.

64. Other analysts confirmed this report in the days after its release. Market analyst Canaccord Genuity downgraded its stock investment rating on RINO from Hold to Sell on November 15, 2010, saying the "Muddy Waters allegations are difficult to dismiss and RINO's real business is at the least likely to be significantly smaller than its reported financial statements suggest."

(1)     **Muddy Waters describes RINO's false financials**

65.     Muddy Waters analyzed the Company's 2009 annual report on SEC Form 10-K. The 2009 Form 10-K reported fiscal year revenues of $192.6 million. But the Company's 2009 corporate filing in China – its SAIC filing -- reported fiscal revenues of only $11.1 million. Muddy Waters concluded that the SAIC filing was largely correct, and that the SEC filing contained significant (and sometimes obvious) errors. For example, the $192.6 million revenue number in RINO's SEC filing largely reflected customer contracts that could not be verified (and later turned out to be fabricated), a large number of "paper" assets that appeared to be fraudulent, and an implausibly high advance for inventory-to-raw materials ratio.

66.     Given the nearly 95% overstatement of the Company's revenues and the draining of Company assets into Zou Dejun and Qui Jianping's private company, Muddy Waters concluded that "RINO's actual consolidated revenue (including VIE) is less than $15 million annually .... RINO's actual profitability is marginal at best." Muddy Waters further warned that "RINO is worth approximately $70 million ($2.45 per share), and falling .... RINO is a shell company with at most $70 million in cash (raised, not generated) and recently acquired assets."

(2)     **Muddy Waters says RINO fabricated customer contracts**

67.     The Muddy Waters report also explained that "RINO has fabricated FGD customer relationships, and therefore significantly overstated revenue. . . . Because FGD historically represents approximately 60%-75% of RINO's reported revenue, these fabrications show that RINO is significantly overstating its revenue." According to Muddy Waters, RINO's revenues were overstated by nearly 95% as a result of the Individual Defendants' deliberate falsification of the Company's FGD customer contracts.

68.     Muddy Waters backed up its conclusions with facts. It "spoke with knowledgeable people at nine of RINO's purported customers. Five of the nine deny having purchased FGD systems from RINO. It is likely that RINO fabricated a sixth customer relationship."

- Panzhihua Iron & Steel confirmed that RINO had built an FGD system for its smallest (180m2) sinter, but that the system did not perform to expectations. Our contact stated, "We are not satisfied with the technology because the desulfurization rate is lower than what we want." It is unlikely to engage RINO in the future.

- Jinan Iron & Steel Group confirmed that RINO built an FGD system in 2005. Our contact would not comment on the report that Jinan took the system offline because it was not performing well. . . . An employee from fabricated client Lai Steel Group stated "I've heard that the sinter built by RINO in Jinan has stopped running. Their technology has no advantage besides not producing wastewater."

73.     Similarly, the International Financial Research & Analysis Group conducted a study on FGD system technology and found a number of specific issues with RINO's technology, including low sulfur reduction rate, high operating cost, higher than advertised upfront investment costs, and poor operational history. As one industry leader stated in the report. "Baosteel has NEVER used RINO's CFB method in any of its FGD projects and is very unlikely to use it in the future due to [significant] problems in their technology."

(3)     Muddy Waters describes RINO's "Cooked Books"

74.     The Individual Defendants have also repeatedly caused RINO to disguise its comparatively weak financial condition. These accounting irregularities include, among others: RINO's misstated value added tax ("VAT") payment disclosures to the SEC, its claimed income tax obligations in China, and its misstated balance sheets regarding asset ownership.

75.     According to RINO's 2009 Form 10-K, RINO pays VAT of 17% on its sales in China, where almost all sales of goods are subject to VAT. However, as Muddy Waters observed in its report, "RINO's disclosures of the [VAT] it pays greatly contradict its reported revenues:

> The inconsistency between VAT and reported revenues highlights the accounting strains resulting from significantly cooking the books. It may also disguise leakage from the Company. RINO discloses in the notes to its financial statements the VAT it supposedly paid. The VAT it pays implies that RINO revenues are significantly greater that what it actually reports.

However, the body of evidence does not suggest that RINO's reporting is conservative. Rather, RINO is overstating its revenue. In the PRC, almost all sales of goods are subject to VAT. As RINO explains, it pays VAT of 17% on its sales. By dividing the VAT amounts from the notes by 17%, we arrived at the implied sales numbers. The implied sales are significantly greater than reported sales quarter after quarter. [Emphasis added].

76. Muddy Waters also concluded that the Company had significantly understated its income tax obligations. RINO's annual reports on Form 10-K for 2008 and 2009 disclose that RINO had no income tax expense. But this directly contradicts both U.S. and Chinese tax law. As Muddy Waters noted, "RINO should have paid income taxes of at least 15% in 2008 and 2009," which would have lowered the Company's reported profits.

77. According to Muddy Waters, RINO has also repeatedly submitted entirely implausible balance sheets that include "an astonishingly small amount of tangible assets for a manufacturer[; r]ather, it is filled with low quality 'paper' assets that balance out the inflated earnings," likely hide misappropriation of funds, and may not even be owned by RINO:

> For RINO, the problem with balance sheets is that they need to balance. As RINO manufactures profits that inflate the equity side of the balance sheet, it needs to show corresponding increases in assets. . . . Buying forged paper is obviously less costly than investing in tangible assets.
>
> RINO manufactures custom products in production times measured in months, with the main input being steel. It is a slow moving asset and labor-intensive production process. Yet, quarter in and quarter out, RINO's tangible operating assets are a small percentage of its overall operating assets. . . .
>
> [In other words,] RINO's raw material balances have not grown in line with sales. Raw materials are one of the best – if not the best – ways of gauging a manufacturer's output. . . . We observe that even the 2007 raw materials balance seems quite low for a company that generated $42.1 million dollars through a slow moving, asset and labor-intensive production process making custom built products. Common sense dictates that a factory such as this could not run a just in time system. The 2007 number becomes even more implausible in 2009. In contrast, Long King and Fei Da [two industry competitors] generated 2008 and 2009 sales no more than 21x raw materials (versus RINO's 2009 figure of 760x).

78. The Individual Defendants also appear to have artificially inflated the Company's "paper" assets to cover up misappropriation of Company funds. In RINO's 2009

Form 10-K, the Company's balance sheet lists advances for inventory 138 times the size of the Company's raw materials assets. The advance for inventory is "far too many times the raw material balance to be taking seriously," according to Muddy Waters, because it indicates that for each day's worth of raw materials RINO keeps on hand, it has "effectively prepaid for 138 to 355 days' worth of raw materials." Obviously, RINO would never agree to such onerous terms. The only other plausible explanation, as discussed below, is that funds were misappropriated under the guise of inventory advances.

        (4)    **The Individual Defendants use Company assets for personal use**

       79.    Muddy Waters reported further that defendants Zou Dejun and Qui Jianping have repeatedly drained money from the Company to finance their own private business and to buy personal items, including a $3.5 million estate in Orange County, California.

       80.    Muddy Waters explained that Zou Dejun and Qui Jianping have repeatedly violated their contractual obligations to RINO by failing to pay money to RINO from their privately held VIE, Dalian Rino. Although the VIE's balance sheets demonstrate that the VIE has generated substantial profit since 2007, Zou Dejun and Qui Jianping have not made any payments to RINO. On the contrary, the VIE's balance sheet dated June 30, 2010 shows that a $156.5 million payment due to RINO was cancelled. Zou Dejun and Qui Jianping are also causing money to flow the wrong way – from RINO into the VIE. According to RINO's 2009 Form 10-K, approximately $40 million in raised funds have been paid into Innomind, yet according to SAIC financial documents, Innomind is nearly devoid of cash or any tangible assets. And shortly after the $40 million was paid into Innomind, VIE received a $36.5 million payment from Innomind. As Muddy Waters observed, this amounts to stealing money directly from the shareholders:

> Because RINO does not own VIE, it has agreements with VIE designed to transfer money and value to RINO. Beyond not honoring those agreements, the management is causing money to flow the wrong way – into VIE. Innomind is lending money to VIE, which is highly improper and alarming because it would mean that *VIE is actually taking money directly from RINO's shareholders*. . . . The money that went into Innomind [and then to VIE] came directly from RINO's equity raises.

81.     Moreover, Zou Dejun and Qui Jianping not only took Company funds for their own business ventures, but also borrowed large sums to finance their personal life. On December 7, 2009, the same day RINO disclosed that it closed a $100 million financing deal, Zou Dejun and Qui Jianping borrowed "approximately $3.5 million" from the Company. Two days later they purchased a $3.2 million home in Orange County, CA. Although the Company timely disclosed the $100 million financing, it was not until March 31, 2010, in its Form 10-K, that the Company disclosed the personal loan to Zuo Dejun and Qui Jianping. Even the late disclosure, however, hid the fact that Zou Dejun and Qui Jianping used the money to buy a home for themselves. Although RINO claims that Zou and Qui repaid the loan on May 10, 2010, the Company never formally disclosed – either before or after making the loan – that the money was borrowed by the CEO and his wife for personal reasons. This "loan" was illegal under both the U.S. securities laws (Sarbanes-Oxley Act of 2002) and under Chinese law as well (PRC Law Article 149).

D.     **The Company confirms part of the Muddy Waters report and begins admitting the truth about its weak financial condition**

82.     On November 10, 2010, after the Muddy Waters report was released, the Company's stock price dropped $2.34 per share to close at $13.18 – a drop of over 15%, on unusually heavy trading volume for the Company (4,126,100 shares).   The next day, November 11, 2010, issued a press release stating that it had "launched an internal review of Muddy Waters' allegations" and promised to "provid[e] investors with a timely and detailed response to the allegations upon completion of its internal review."   The Company's stock dropped another $2.08 per share, on volume of 6,313,600 shares, to close at $11.10 per share. Nevertheless, RINO has yet to provide the promised detailed response.   On the contrary, subsequent Company disclosures have confirmed the truth of the Muddy Waters analysis.

83.     On November 15, 2010, the Company announced extremely disappointing third quarter 2010 results, as shown by these highlights from the Company's press release:

- Total revenues in the third quarter of 2010 were $52.7 million, a 16.7% decrease from the corresponding period in 2009.

- Operating profit in the third quarter of 2010 was $9.9 million, a 49.3% decrease for the corresponding period in 2009.

- Net income in the third quarter of 2010 was $8.8 million, a 48.3% decrease from the corresponding period in 2009.   Net income excluding a change in fair value of warrants (non-GAAP) was $8.7 million, a 55.6% decrease from the corresponding period in 2009.

- Diluted earnings per share ("EPS") for the third quarter of 2010 was $0.31.   Diluted EPS excluding change in fair value of warrants (non-GAAP) was $0.31, a 60.8% decrease from $0.78 for the corresponding period in 2009.

- Cash and cash equivalents as of September 30, 2010 were $56.1 million, representing a decrease of 58.3% as compared to $134.5 million as of December 31, 2009.

- Accounts receivable stood at $112.0 million, a 93.8% increase from $57.8 million reported as of December 31, 2009.

In addition, the Company significantly revised downward its outlook for fiscal year 2010, from a previously estimated range of $221-229 million to a range of $203-211 million.

84.   On November 17, 2010, RINO cancelled its 3rd quarter conference call, sending its stock down an additional $1.48 per share before trading was halted "pending further news from the company."

85.   On November 19, 2010, the Company filed a Form 8-K telling investors they could no longer rely upon nearly three years of financial statements previously issued by the Company, because some of RINO's contracts were fictitious – the very problem the Muddy Waters report had identified.   In Item 4.02 of an amended SEC Form 8-K, the Company disclosed the contents of a November 17, 2010 letter it had received from its outside auditor, Frazer Frost LLP ("Frazer Frost"):

'In a telephone conversation on November 16, 2010, Mr. Zou Dejun the Chief Executive Officer of the Company, informed Ms. Susan Woo of our firm, in substance, that as to the six RINO

customer contracts discussed in the recent report of Muddy Waters LLC, the Company did not in fact enter into two of the six purported contracts, and a third contract among the six was explainable.  When Ms. Woo inquired about the Company's other contracts, Mr. Zou said he was not sure, but there might be problems with 20 – 40% of them. Assuming that these statements were reasonably accurate, it appears that our reports would have been affected if this information had been known to us at the date of our reports, although the effect on the financial statements is currently unknown and cannot be quantified without a thorough investigation. We further note that in a conversation the following day, November 17, 2010, involving Ms. Woo, several directors of the Company, Company counsel, and Mr. Zou, Mr. Zou stated that he was not sure the day before and went back to look into some things. and found that apart from the two problematic contracts, all other contracts are legitimate and can be verified.

The auditing standards of the Public Company Accounting Oversight Board provide procedures to be followed by an auditor to prevent continued reliance on audit reports in such circumstances. In view of the information provided by Mr. Zou Dejun, we hereby advise the Company to promptly notify any person or entity that is known to be relying upon or is likely to rely upon our audit **report(s) for the periods ended December 31, 2008 and December 31, 2009 and reviewed quarterly financial statements for periods between March 31, 2008 to September 30, 2010** should no longer be relied upon, and that revised financial statements and revised auditor's report(s) will be issued upon completion of an investigation.' [Emphasis added].

86.    The Company issued another Form 8-K on November 19, 2010 adopting the conclusions of Frazer Frost:

On November 18, 2010, the Board of Directors (the "Board") of RINO ..., concluded that previously issued audited financial statements ... for its fiscal years ended December 31, 2008 and 2009, which were included in the [Company's] Annual Reports on Form 10-K fo the fiscal years ended December 31, 2008 and 2009, and previously issued interim unaudited financial statements which were included in the [Company's] Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on. The Board also concluded that previously issued interim unaudited financial statements which were included in the [Company's] Quarterly Reports on Form 10-Q for the periods March 31, 2010, June 30, 2010 and September 30,

25

2010 should no longer be relied on inasmuch as such financial statements incorporate results from 2008 and 2009.

The conclusion of the Board that the financial statements for the above-described periods should not be relied upon was based on statements made by the [Company's] Chief Executive Officer, Mr. Zou Dejun, after consultation with the [Company's] Chief Accountant, who reported to the Board that the [Company] did not enter into two contracts for which it reported revenue during the [Company's]2008 and 2009 fiscal years.

Three of the [Company'] Board members, including the Chairman of the Audit Committee and Chief Executive Officer, discussed the foregoing matters with the [Company's] independent accountant on November 16 and 17, 2010.

The [Company's] Board has authorized its Audit Committee to take all steps necessary to investigate the matters set forth above and other allegations of misstatements, and address any deficiencies found, including authorization to engage an outside law firm to conduct an independent investigation with the assistance of such other professionals as it may require.

87.     The harm to the Company was swift and substantial.  On November 9, 2010, RINO's stock closed at $15.25 per share, representing a market capitalization of about $436 million. By November 17, 2010, RINO's stock had tumbled to $6.07 per share after news of the disappointing 3rd quarter earnings (November 15, 2010 press release); (b) indefinite postponement of its 3rd quarter conference call (November 17, 2010); and (c) the filing of its amended Form 8-K (November 17, 2010), quoted above, disclosing the fabricated customer contracts. *Thus, in the span of one week, nearly $263 million of RINO's shareholder value was destroyed.*

88.     After the market closed on November 17, 2010, NASDAQ suspended trading of RINO stock and requested additional information from the Company regarding allegations raised by the Muddy Waters report.  **The Individual Defendants, however, never provided this information to NASDAQ.**

89.     On November 24, 2010, the SEC's Division of Corporate Finance in Washington, D.C. wrote to defendant Ben Wang, RINO's Chief Financial Officer.  The SEC

asked whether the Company intended to file restated financials in light of the Company's recent disclosure that its issued financials could not be relied upon, and if so, when and how the Company intended to do so.

90.    On December 2, 2010 RINO filed a Form 8-K stating that on November 29, 2010, NASDAQ had sent RINO a letter stating that it would delist RINO's stock from its exchange effective December 8, 2010.  (Form 8-K filed 12/2/10).  The Company's Form 8-K stated:

On November 29, 2010 RINO ... received a letter from The NASDAQ ... stating that based upon its review of the Company and pursuant to NASDAQ Listing Rules 5101, 5250(a)(1) ad 5250(c)(1), the staff of NASDAQ believes that the continued listing of the Company's securities on NASDAQ is no longer warranted .... NASDAQ stated that its staff determination was based upon the following:

1. The Company's announcement that its previously filed financial reports for fiscal 2008, 2009 and year-to-date 2010 could no longer be relied upon;

2. The Company's admission that it had not entered into certain previously disclosed contracts; and

3. The Company's failure to respond to the NASDAQ staff's request for additional information regarding allegations raised by the Muddy Waters, LLC report.

91.    In its December 2, 2010 Form 8-K, the Company stated that it did not intend to contest the delisting of its shares from NASDAQ, but that it intended to file restated financial statements for its fiscal years ended December 31, 2008 and 2009 and for the quarterly periods included in the Company's quarterly reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2010.  The Company also disclosed in its December 2, 2010 Form 8-K that it had been notified by the SEC that the SEC was conducting "a formal investigation relating to the Company's financial reporting and compliance with the Foreign Corrupt Practices Act for the period January 1, 2008 through the present."  The Company stated it was impossible "to predict the outcome of the investigation, including whether or when any

1   proceedings might be initiated, when these matters may be resolved or what if any penalties or

2   other remedies may be imposed."

3        92.    Trading in the Company's stock was halted from the close of trading on

4   November 17 to December 8, 2010. The Company's stock closed at $3.15 on December 8,

5   2010 on heavy volume (3,338,200 shares).  Since then, it has declined further and currently

6   trades in the pink sheets at approximately $1.65 per share.

7        **E.     The SEC Investigates RINO for Violations of the FCPA**

8    93. On December 2, 2010, RINO disclosed that the SEC had begun a formal investigation

9        into whether RINO had violated the Foreign Corrupt Practices Act:

10       The company has been notified by the Staff of the Securities and Exchange
         Commission that it is conducting a formal investigation relating to the
11       Company's financial reporting and compliance with the Foreign Corrupt
         Practices Act. The Company is cooperating with the SEC's investigation. It is
12       not possible to predict the outcome of the investigation, including whether or
         when any proceedings might be initiated, when these matters may be resolved
13       or what if any penalties or other remedies may be imposed

14       94.    A formal SEC investigation is a serious matter, and much different than an

15   informal inquiry.   Moreover, RINO is the first wholly China-operated company to be

16   investigated under the FCPA.  The SEC's willingness to extend the jurisdictional reach of the

17   FCPA for the first time to formally investigate RINO provides further evidence of the extent

18   and breadth of RINO's wrongdoing.

19       **F.     The Individual Defendants' materially false public statements**

20       95.    Because RINO  intends to file restated financial reports from 2008 to October

21   2010, it is clear that during this period, the Individual Defendants have caused the Company to

22   make numerous materially false and misleading statements through SEC filings and press

23   releases regarding the Company's assets, total revenues and projected revenues, and about the

24   Company's share of the FGD market, number of FGD customers, and tax obligations in both

25   the U.S. and China. These false statements are summarized below.

26       96.    On May 15, 2008, the Company filed its quarterly report on SEC Form 10-Q

27   for the 2008 fiscal first quarter, signed by defendant Bruce Richardson. The Form 10-Q stated

28   that the Company's financial statements contained within it were "prepared in accordance with

1   accounting principles generally accepted in the United States of America." The Form 10-Q

2   also contained the certification of the Company's financial statements required by the

3   Sarbanes-Oxley Act of 2002.   Defendants Bruce Richardson and Zou Dejun signed the

4   certifications, which stated in relevant part that they had reviewed the quarterly report on Form

5   10-Q; that the financial statements did not contain any untrue statements or material

6   omissions; that the financial statements and other financial information included in the report

7   fairly presented in all material respects the financial condition, results of operations and cash

8   flows of the Company as of, and for, the period presented in the report; that they were

9   responsible for establishing and maintaining proper controls and internal control over financial

10   reporting for the Company; that they had disclosed to the Company's auditors all significant

11   deficiencies and weaknesses in the design or operation of internal controls over financial

12   reporting and any fraud involving management or employees who have a role in the

13   Company's internal control over financial reporting; that the quarterly report fully complied

14   with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

15   that the information contained in the quarterly report fairly presented, in all material respects,

16   the financial condition of the Company and the results of operations.

17       97.    On August 14, 2008, the Company filed its Form 10-Q for the 2008 fiscal

18   second quarter, signed by Bruce Richardson. The Form 10-Q contained the required Sarbanes-

19   Oxley certifications, described above, signed by defendants Bruce Richardson and Zuo Dejun.

20       98.    On November 12, 2008, RINO filed its third quarter 2008 Form 10-Q, signed

21   by Zou Dejun, and certified under Sarbanes-Oxley as described above by defendants Zou

22   Dejun and Qui Jianping. The Form 10-Q reported record net sales of $44.9 million, gross

23   profit of $20.6 million, net income of $9.9 million, and earnings per diluted share of $0.39.

24       99.    On February 17, 2009, RINO issued a press release reporting its expected

25   fourth quarter and year-end 2008 earnings results.   RINO also gave its fiscal year 2009

26   guidance, stating that projected revenue would exceed $176 million in 2009.  Defendant Zou

27   Dejun stated in part that "we expect 2009 revenues for waste water treatment, desulphurization

28

1   and anti-oxidation revenues to grow by approximately 50%, 10%, and 300%, respectively,

2   compared with 2008 while maintaining a similar margin profile."

3       100.  On March 31, 2009, RINO filed its annual report on Form 10-K for its 2008

4   fiscal year, signed by defendants Zuo Dejun, Qui Jianping, Zhang Weiguo, Quan Xie, and

5   Kennith Johnson. The 2008 Form 10-K stated that it had been prepared in accordance with

6   GAAP, and contained the required Sarbanes-Oxley certifications described above signed by

7   Zou Dejun and Qui Jianping. On April 2, 2009, the Company issued a press release discussing

8   the financial results reported in RINO's 2008 Form 10-K for the fourth quarter and fiscal year

9   2008.

10       101.  Defendant Moore Stephens Wurth Frazer and Torbet, LLP signed RINO's 2008

11   Form 10-K, in which it gave RINO an unqualified audit opinion and stated that RINO's

12   financial results complied with GAAP in all respects. The 2008 Form 10-K included the

13   following signed statement from Moore Stephens Wurth Frazer and Torbet, LLP:

14

15       "To the Board of Directors and
       Stockholders of Rino International Corporation and Subsidiaries

16

17       "We have audited the accompanying consolidated balance sheet of Rino International
       Corporation and subsidiaries as of December 31, 2008, and the related consolidated
18      statements of income and other comprehensive income, shareholders' equity, and cash
       flows for the year then ended. These consolidated financial statements are the
19      responsibility of the Company's management. Our responsibility is to express an
       opinion on these consolidated financial statements based on our audit. The
20      consolidated financial statements of Rino International Corporation and subsidiaries as
       of December 31, 2007 in the accompanying consolidated financial statements were
21      audited by other auditors whose report dated January 23, 2008 expressed an
       unqualified opinion on those statements, except for Notes 4 and 19 which were restated
22      on June 6, 2008 and Notes 15 and 21 which were restated on July 21, 2008.

23       "We conducted our audit in accordance with the standards of the Public Company
24      Accounting Oversight "Board (United States). Those standards require that we plan
       and perform the audit to obtain reasonable assurance about whether the financial
25      statements are free of material misstatement. The Company is not required to have, nor
       were we engaged to perform, an audit of its internal control over financial reporting.
26      Our audit included consideration of internal control over financial reporting as a basis
       for designing audit procedures that are appropriate in the circumstances, but not for the
27      purpose of expressing an opinion on the effectiveness of the company's internal control
       over financial reporting. Accordingly, we express no such opinion. An audit also
28

includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

"In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Rino International Corporation and subsidiaries as of December 31, 2008 and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

/S/ Moore Stephens Wurth Frazer and Torbet, LLP

Walnut, California
March 30, 2009."

102.    On May 15, 2009, RINO issued a press release reporting its first quarter 2009 earnings results.   The Company reported net income of $12.5 million, or $0.50 diluted earnings per share, and revenue of $35.6 million for the quarter ending March 31, 2009.  On March 15, 2009. the Company also filed its Form 10-Q for the first quarter of 2009, signed by Zou Dejun, and containing the required Sarbanes-Oxley certifications described above signed by Zou Dejun and Qui Jianping.

103.    On August 10, 2009, RINO issued a press release reporting its second quarter 2009 earnings results.   The Company reported net income of $9.9 million, or $.0.39 diluted EPS, and revenue of $40.7 million for the quarter ending June 30, 2009.  The Company also filed its quarterly report on Form 10-Q for the second quarter of 2009, signed by defendants Zou Dejun and Jenny Liu.    The Form 10-Q stated that the Company's financial statements were prepared in conformity with GAAP, and contained the required Sarbanes-Oxley certifications, described above, signed by defendants Zou Dejun and Jenny Liu.

104.    On November 13, 2009, RINO issued a press release reporting its third quarter 2009 earnings reslts.  The Company reported net income of $19.7 million, or $0.78 per diluted EPS, and revenue of $63.3 million for the quarter ending September 30, 2009.  On November 13, 2009, the Company also filed its quarterly report on Form 10-Q for its third fiscal quarter of 2009, signed by defendant Zou Dejun.   The Form 10-Q stated that the financial statements

1  contained in it were prepared in conformity with GAAP, and contained the required Sarbanes-

2  Oxley certifications, described above, signed by defendants Zou Dejun and Jenny Liu.

3      105.   On March 31, 2010, RINO filed its Form 10-K for its fourth quarter and fiscal

4  year 2009, signed by defendants Zou Dejun, Jenny Liu, Yu Li, Qui Jianping, Zhang Weiguo,

5  Quan Xie, and Kennith Johnson, and containing the required Sarbanes-Oxley certifications

6  described above signed by Zou Dejun, Jenny Liu, and Yu Li.   The Company reported net

7  income of $13.5 million, or $0.53 diluted earnings per share, and record revenue of $53.0

8  million for the fourth quarter of 2009.  For the year ended December 31, 2009, the Company

9  reported net income of $56.4 million, or $2.26 diluted EPS, and revenue of $192.6 million.

10  The 2009 Form 10-K stated that the financial statements contained within it were prepared in

11  conformity with GAAP, and contained the required Sarbanes-Oxley certifications, described

12  above, signed by defendants Zou Dejun and Jenny Liu.

13      106.   RINO's 2009 Form 10-K and its 2009 year-end financial statements were

14  signed by Defendant Frazer Frost, which indicated that the financial results complied with

15  GAAP. Frazer Frost stated in the 10-K:

16  "To the Board of Directors and
17  Stockholders of Rino International Corporation

18  "We have audited the accompanying consolidated balance sheets of Rino International
19  Corporation and Subsidiaries as of December 31, 2009 and 2008, and the related
   consolidated statements of income and other comprehensive income, shareholders'
20  equity, and cash flows for each of the years in the two-year period ended December 31,
   2009. Rino International Corporation's management is responsible for these
21  consolidated financial statements. Our responsibility is to express an opinion on these
   financial statements based on our audits.

22  "We conducted our audits in accordance with the standards of the Public Company
23  Accounting Oversight Board (United States). Those standards require that we plan and
   perform the audit to obtain reasonable assurance about whether the financial statements
24  are free of material misstatement. The company is not required to have, nor were we
   engaged to perform, an audit of its internal control over financial reporting. Our audit
25  included consideration of internal control over financial reporting as a basis for
26  designing audit procedures that are appropriate in the circumstances, but not for the
   purpose of expressing an opinion on the effectiveness of the company's internal control
27  over financial reporting. Accordingly, we express no such opinion. An audit also
   includes examining, on a test basis, evidence supporting the amounts and disclosures in
28  the financial statements, assessing the accounting principles used and significant

32

estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

"In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Rino International Corporation and Subsidiaries as of December 31, 2009 and 2008, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America.

/s/ Frazer Frost, LLP (Successor Entity of Moore Stephens Wurth Frazer and Torbet, LLP, see Form 8-K filed on January 7, 2010)

Brea. California

March 29, 2010


107.     The financial statements in ¶¶95-106 were materially false and misleading because they reported net income and revenues that were grossly overstated.  The Individual Defendants and Frazer Frost LLP and Moore Stephens Wurth Frazer and Torbet, LLP knew and/or were reckless in not knowing that these statements were false at the time that they caused the Company to publish them and/or certified the statements and financial results. These statements were false and misleading because they were based on false revenue reported from customer contracts that did not exist.  The Individual Defendants and Frazer Frost LLP and Moore Stephens Wurth Frazer and Torbet, LLP knew and/or were reckless in not knowing that throughout 2009 a significant number of the Company's customer relationships were fabricated and the revenues reported from these relationships did not exist.  As one analyst remarked on November 10, 2010, the Company's fiscal year 2009 results were overstated by as much as 95%.

108.     On May 14, 2010, the Company filed its quarterly report on Form 10-Q for the first fiscal quarter of 2010, signed by defendant Zou Dejun.  The Form 10-Q stated that the financial statements contained within it had been presented in conformity with GAAP.  The Form 10-Q contained the required Sarbanes-Oxley certifications, described above, signed by defendants Zou Dejun and Ben Wang. The Company reported net income of $8.5 million, or

$0.30 diluted EPS, and revenue of $47.9 million for the quarter ended March 31, 2010.  On May 17, 2010, RINO issued a press release announcing its first quarter 2010 financial results.

109.   On August 16, 2010, RINO issued a press release reporting its second quarter 2010 financial results.  The Company reported net income of $15.5 million, or $0.54 diluted EPS, and revenue of $65.4 million for the quarter ended June 30, 2010.  On August 16, 2010, the Company also filed its quarterly report on Form 10-Q for the second fiscal quarter of 2010, signed by defendant Zou Dejun.  The Form 10-Q stated that it the financial statements contained within it were prepared in accordance with GAAP, and contained the required Sarbanes-Oxley certifications, described above, signed by defendants Zou Dejun and Ben Wang.

110.   The financial statements in ¶¶108-09 were materially false and misleading because they reported net income and revenues that were grossly overstated.  The Individual Defendants knew and/or were reckless in not knowing that these statements were false at the time that they caused the Company to publish them.  These statements were false and misleading because they were based on false revenue reported from customer contracts that did not exist.  The Individual Defendants knew and/or were reckless in not knowing that throughout 2010 a significant number of the Company's customer relationships were fabricated and the revenues reported from these relationships did not exist.

111.   In addition to causing the Company to issue false and misleading revenue reports throughout the Relevant Period, the Individual Defendants also caused the Company to significantly overstate its FGD market share and technological capabilities, further misleading the investing public.  For example, in its 2009 Form 10-K, RINO lists Yuhua Steel Co. Limited ("Yuhua"), Chongqing Iron & Steel ("Chongqing") and Nanchang Changli Iron & Steel ("Changli") as significant customers of their FGD systems.  However, an investigation conducted by Muddy Waters, based on publicly available information and individual interviews with company officials, showed that these statements were false and the that customer relationships were fabricated, because none of the companies had ever purchased an FGD system from RINO.

34

112.   Similarly, RINO's March 2010 Investor Presentation to public shareholders contained false and misleading information about the Company's FGD customer list and market penetration.   In particular, this presentation stated that Yueyufeng Steel Group ("Yueyufeng") and Lai Steel Group ("Lai") were significant customers who had purchased RINO's FGD systems.   However, Muddy Waters confirmed in interviews with executives from each company that these statements were false.   Neither company had ever purchased an FGD system nor any other product from RINO.

113.   The Individual Defendants also caused the Company to issue false and misleading statements regarding RINO's technological capabilities and market penetration relative to its FGD competitors.   In its 2009 Form 10-K the Company reported that it was the only company producing FGD systems for steel sinters, and that it had a "two to three year-lead" over potential competitors.   However, this statement was false, because eight months previously Long King, a major competitor, had announced it had completed one of the largest steel sinter FGD projects in the world.   Indeed, a study conducted by the Chinese government's Ministry of Information and Industry Technology found that over 35 steel sinter FGD systems had been installed by the end of 2009, with RINO having been involved in only a few of them.

## ROLE OF THE COMPANY'S AUDITORS – MOORE STEPHENS WURTH FRAZER AND TORBET, LLP and FRAZER FROST LLP

114.   The breaches of fiduciary duty committed by the Individual Defendants could not have been successful without the active participation of Moore Stephens Wurth Frazer and Torbet, LLP and Frazer Frost LLP (hereinafter collectively referred to as "Frazer Frost"), RINO's auditors during the Relevant Time Period.   Frazer Frost failed to comply with GAAP and conducted itself such that it conducted no real audit of RINO.

115.   It was no coincidence that Frazer Frost was an auditor for many other Chinese companies that went public in the U.S. through the "backdoor" – i.e., without conducting an IPO.

116.    Frazer Frost appears to have folded its doors in the wake of its involvement in the RINO fraud.

117.    RINO's 10-K listed the following about Frazer Frost: "Moore, Stephens Wurth Frazer and Torbet, LLP ("MSWFT"), located at 135 South State College Blvd., Suite 300, Brea, CA 92821 was approved by our audit committee and board of directors to be our new independent accountant. Effective on January 1, 2010, certain partners of MSWFT and Frost, PLLC ("Frost") formed Frazer Frost, LLP, which became the Company's new independent accounting firm.)"

118.    Frazer Frost acted as auditor to at least 26 public companies. It is no surprise that among the company's clients is a preponderance of Chinese companies (many of which have used the recent Chinese IPO bubble to list on various American exchanges), including the following:



*Source: Capital IQ.*

## VI.   DAMAGES TO THE COMPANY

119.   The Individual Defendants' wrongful conduct caused RINO to disseminate false and misleading financial information concerning its revenues, profits, and customer contracts over a span of nearly three years. As a result, RINO is now named as a defendant in securities fraud class action lawsuits. *See, e.g., Hufnagle v. Rino International Corporation, et al.*, Case No. 2:10-cv-08695-VBF-VBK (C.D. Ca.) and numerous related actions. Also named as defendants in those securities fraud class actions are: Zou Dejun, Qui Jianping, Jenny Liu, Ben Wang, Li Yu, Kennith Johnson, Li Zejin, and Quan Xie.   The SEC is also formally investigating RINO's financial reporting and compliance with the Foreign Corrupt Practices Act.

120.   RINO's market capitalization has significantly shrunk since the revelations of the Company's fraud making the Company less valuable to shareholders and to any potential acquirer.

121.   As a direct and proximate result of the Individual Defendants' actions, RINO has expended and will continue to expend significant sums of money, including but not limited to:  (a) accounting and legal fees to effect the restatement of the Company's financials for fiscal year 2008 and 2009, and all of the interim reporting periods from the first quarter of 2008 to the second quarter of 2010; (b) attorneys' fees and investigative costs in connection with the defense of the class action lawsuits, including the cost of any adverse judgments against the Company or indemnification of any of the Individual Defendants; (c) attorneys' fees and costs connected with the defense of the Company and its officers and directors in the SEC's formal investigation into the Company's financial reporting and compliance with the Foreign Corrupt Practices Act; (d) the payment of compensation and benefits to the Individual Defendants based at least in part on RINO's artificially inflated stock price and inflated revenues; (e) the costs incurred from the likely loss of the Company's remaining customers due to the revelation of fraud at the top levels of management.

122. Moreover, the Individual Defendants have caused damage to RINO's corporate image and goodwill. The Board has misled the public, which will likely raise the cost of capital, and virtually close the equity and debt markets to RINO, perhaps for years to come.

## VII.  DERIVATIVE & DEMAND FUTILITY ALLEGATIONS

123. In accordance with Rule 23.1 of the Nevada Rules of Civil Procedure, plaintiffs bring this action derivatively in the right and for the benefit of RINO to redress injuries suffered, and to be suffered, by RINO as a direct result of the breaches of fiduciary duty, as well as the aiding and abetting thereof, waste of corporate assets and unjust enrichment by the Individual Defendants. RINO is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

124. Plaintiffs will adequately and fairly represent the interests of RINO in enforcing and prosecuting its rights.

125. Plaintiffs have held the stock of RINO during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

126. When this Verified First Amended Consolidated Shareholder Derivative Complaint was filed, the Board consisted of only two defendants -- Zou Dejun and Qui Jianping. As indicated *supra*, the remaining members of RINO's board previously resigned either prior to or on or about March 31, 2011. Plaintiffs have not made a pre-suit demand on Board members Dejun and Jianping to bring suit because such a demand would be a futile, wasteful and useless act, and is thus excused. Demand is futile for all of the reasons alleged herein.

127. Defendants Zou Dejun and Qui Jianping are not independent, as acknowledged by the Company in listing them as "non-independent directors" in RINO's 2009 Form 10-K and a posting on the Company's website. Defendants Zou Dejun and Qui Jianping are also married, a personal relationship that ensures neither will sue the other or exercise independent business judgment. Zou Dejun and Qui Jianping also lack independence because of the

1   substantial compensation they receive, their status as the Company's co-founders, and their

2   majority ownership of the Company's shares.  Zou Dejun owns or controls 58.32% of the

3   Company's stock, and Qui Jianping owns or controls 6.26% of RINO's common stock. (2009

4   Form 10-K, filed with the SEC 3/31/10).  Finally, Zou Dejun and Qui Jianping breached their

5   fiduciary duties of loyalty and good faith by personally financially benefitting from their

6   wrongdoing.  Dejun and Jianping borrowed $3.5 million in an unsecured and interest free loan

7   which they used to buy a home for themselves in California. They obviously have a personal

8   interest in this transaction and cannot review it in a disinterested manner required of

9   independent directors.

10       128.   Dejun and Jianping also lack independence because they received an improper

11   personal financial benefit in the form of the illegal $3.5 million loan to Zou Dejun and Qui

12   Jianping. When the loan was given to Zou Dejun and Qui Jianping in December 2009, the

13   Board of RINO was composed of Zou Dejun, Qui Jianping, Kennith Johnson, Quan Xie, and

14   Zhang Weiguo (since departed from the Company).  Zou Dejun, Qui Jianping, Kennith

15   Johnson, and Quan Xie thus constitute four of the five Board members who caused this illegal

16   loan to be made to Zou Dejun and Qui Jianping, and who hid it from public disclosure for

17   many months.  These actions show that the Board is dominated and controlled by the majority

18   shareholders, Zou Dejun and Qui Jianping. The Board's domination and control by Zou Dejun

19   and Qui Jianping is further supported by the fact that defendants Zou Dejun and Qui Jianping

20   have repeatedly violated their contractual obligations – without any opposition by the Board –

21   by failing to pay money to RINO from their privately held VIE.  Although the VIE has

22   generated substantial profit since 2007, Zou Dejun and Qui Jianping have not made any

23   payments to RINO and have, in fact, caused money to go from RINO to the VIE.

24       129.   Dejun and Jianping are also not independent and disinterested because they are

25   named as defendants in the securities fraud class action complaint which is premised on

26   similar facts as this case.  Dejun and Jianping approved the Company's materially inaccurate

27   and inflated financial statements in violation of GAAP and the federal securities laws. Zou

28   Dejun, Qui Jianping, Kennith Johnson, and Quan Xie, repeatedly approved the Company's

public filings with SEC which contained the false financials the Company now admits it must restate. The fact that these directors approved false financial statements and public statements to the press and to analysts based on inflated revenues and fictitious contracts, and did so for ten consecutive quarters, from the first quarter of 2008 to the second quarter of 2010, is strong evidence that these Board members are incapable of considering a pre-suit demand with disinterest and independence. On the contrary, their actions show they lack any independence and are dominated and controlled by Zuo Dejun and Qui Jianping.

130.   The Company's statement on Corporate Governance dictates the roles of the Board, which include the following: Monitor overall corporate performance, the integrity of the Company's financial controls and the effectiveness of its legal compliance programs; Oversee management; Review and adopt the Company's long-term strategic direction and approve specific objectives; Ensure that necessary resources are available to pursue the strategies and achieve objectives; and Develop with management broad strategies for enhancing shareholder value.

131.   Dejun and Jianping failed to properly fill any of the above roles. They breached their fiduciary duties of due care, loyalty, and good faith when the Company issued statements and earnings press releases that contained false and/or misleading material information.   Each failed to properly ensure: (i) the Company's revenues, profits, and corporate performance was adequate; (ii) that the Company's stated customer relationships actually existed; (iii) that the Company's long-term direction was proper; and (ii) that none of the Company's money or assets were improperly misappropriated.  Thus, Dejun and Jianping face a sufficiently substantial likelihood of liability for their breach of fiduciary duties making any demand upon them futile.

132.   Dejun and Jianping are also not independent and disinterested because, as alleged *supra*, they ignored the results and recommendation of the lawyers and accountants retained by the Company's Audit Committee concerning the investigation into the very wrongdoing alleged in this complaint.  Defendants Kennith Johnson and Quan Xie were members of the Audit Committee from March 2008 until their resignation in 2011.  As

members of the Audit Committee, Kennith Johnson and Quan Xie were charged under the Audit Committee charter with overseeing the Company's accounting and financial reporting process, reviewing the Company's audited results and annual and interim financial statements, and discussing these statements prior to filing them with the SEC. Kennith Johnson and Quan Xie were thus expressly responsible for overseeing and directly participating in disseminating RINO's earnings press releases. As indicated *supra*, the Audit Committee retained outside lawyers and forensic accountants to investigate the wrongdoing alleged herein. In early 2011, the lawyers and accountants presented findings to the Audit Committee and to Dejun and Jianping. In response to these findings, Dejun and Jianping refused to acknowledge the findings and refused to authorize action against themselves and other culpable parties.

133.   Zou Dejun and Qui Jianping allowed the Company to file two sets of financial statements – one with the SEC and the other with the SAIC. The Company's U.S. financials radically diverged from the small sums of revenue reported to the Chinese agency, the SAIC. No valid business judgment explains or justifies this conduct, and it is a further instance of the Board's lack of independence and domination by Zou Dejun and Qui Jianping.

134.   The acts complained of constitute violations of the fiduciary duties of good faith and loyalty owed by RINO's officers and directors, and these acts are incapable of ratification. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public or made to securities analysts and thus distributed to shareholders, authorized and/or permitted the issuance of false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. As a result, any suit by the current Board of RINO to remedy these wrongs would likely expose the Individual Defendants and RINO to violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

135.   To the extent that RINO's current and past officers and directors are protected against personal liability for mismanagement and breach of fiduciary duty by directors' and officers' liability insurance ("D&O insurance"), they caused the Company to purchase such

insurance with corporate funds.  However, due to certain changes in the language of D&O insurance policies in the past few years, the D&O insurance policies covering the Individual Defendants contain provisions eliminating coverage for any action brought directly by RINO against them, often called the "insured versus insured exclusion."  As a result, if the current Board were to agree to effectively sue themselves or certain of the officers of RINO, they would all lose D&O insurance coverage, a further reason negating their independence. If there is no D&O insurance available, the current directors will not cause RINO to sue them, and expose them to a large uninsured liability. On the other hand, if the suit is brought derivatively, as this action is brought, D&O insurance coverage still applies and will permit the Company to effectuate recovery.

## VIII.   CAUSES OF ACTION

### COUNT ONE

**Derivative Claim Against All Individual Defendants for Breach of Fiduciary Duty**

136.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

137.    The Individual Defendants owed and owe RINO fiduciary duties.  By reason of their fiduciary relationships, the Individual Defendants owed and owe RINO the highest obligation of good faith, fair dealing, loyalty and due care.

138.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

139.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects, operations and revenues of the Company and failed to correct the Company's publicly reported financial guidance.  These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

140.    Defendants are not entitled to the protection of the business judgment rule with respect to the transactions challenged in this complaint because the Defendants failed to act in

good faith, breached their duties of loyalty, and failed to inform themselves before taking action. In addition, Defendants have admitted that the Company failed to adopt and implement adequate internal controls during the Relevant Time Period.

141.    The Defendants breached their duty of loyalty and good faith, as alleged supra, by stealing money from RINO and by authorizing Dejun and Jianping to steal money from RINO through transactions that wholly lacked any legitimate corporate purpose and in exchange for which RINO received absolutely no consideration. Defendants were aware of these transactions, authorized and ratified the transactions, and have taken no action to obtain redress for such transactions subsequent to the time of the transactions.

142.    Defendants have also breached their duties of good faith and loyalty by causing the Company to violate the Foreign Corrupt Practices Act.

143.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, RINO has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

144.    Additionally, by their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties of good faith and loyalty with regard to prudently managing the assets and business of RINO in a manner consistent with the operations of a publicly held corporation.

145.    As a direct and proximate result of the Individual Defendants' mismanagement and breaches of duty alleged herein, RINO has sustained significant damages in excess of hundreds of millions of dollars. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

146.    Plaintiffs on behalf of RINO have no adequate remedy at law.

## COUNT TWO

### Derivative Claim Against All Individual Defendants for Waste of Corporate Assets

147.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

148.    Plaintiffs allege this cause of action on behalf of the Company against all of the Individual Defendants.

149.    Each of the Individual Defendants owes and owed to the Company the obligation to protect its assets from loss or waste.

150.    As specified above, by any objective assessment, the Individual Defendants' failure to properly oversee the business and operations of the Company, including their deliberate actions to misappropriate and/or their failure to prevent the misappropriation of millions of dollars of Company assets into the private business of Defendants Zou Dejun and Qui Jianping and for the purchase of a private luxury home for defendants Zou Dejun and Qui Jianping resulted in the waste of corporate assets.  The misappropriation of RINO's money by Dejun and Jianping was illegal and wholly for personal reasons, unrelated in any way to any proper corporate purpose.  RINO received absolutely no consideration for the relevant transactions, which constituted theft.  Moreover, the RINO board never made any good faith determination that the misappropriation of corporate money and funds by Dejun and Jianping served any legitimate corporate purpose or that RINO receive any consideration whatsoever for such misappropriation of corporate funds by Dejun and Jianping.

151.    By reason of the foregoing, the Company has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

152.    Plaintiffs on behalf of RINO have no adequate remedy at law.

## COUNT THREE

### Derivative Claim Against Defendants Dejun and Jianping for Unjust Enrichment

153.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

154.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of RINO, including by wrongfully receiving RINO stock at an artificially inflated price from the Company's escrow account, wrongfully

appropriating Company funds into the private business of defendants Zou Dejun and Qui Jianping, and misappropriating funds into the purchase of a luxury home for defendants Zou Dejun and Qui Jianping.

155.    Plaintiffs, as shareholders and representatives of RINO, seek restitution from these defendants, and each of them, and an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

156.    If Plaintiffs are found to have no adequate remedy at law for damages, they seek to recover for unjust enrichment as alleged in this count.

## FOURTH CAUSE OF ACTION
### Against All Individual Defendants For Gross Mismanagement

157.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

158.    The Individual Defendants had a duty to RINO and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of RINO.

159.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of RINO in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of RINO's affairs and in the use and preservation of RINO's assets.

160.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused RINO to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to RINO, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged RINO.

## FIFTH CAUSE OF ACTION
### Against All Individual Defendants For Abuse Of Control

161.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

162.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence RINO, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing RINO to misrepresent material facts regarding its financial position and business prospects.

163.    As a direct and proximate result of Defendants' abuse of control, RINO has sustained significant damages.

164.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

165.    Plaintiffs, on behalf of RINO, have no adequate remedy at law.

## SIXTH CAUSE OF ACTION
### Derivative Claim for Professional Negligence and Accounting Malpractice Against Defendants Moore Stephens Wurth Frazer and Torbet, LLP and Frazer Frost LLP

166.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

167.    Moore Stephens Wurth Frazer and Torbet, LLP and Frazer Frost LLP (collectively referred to herein as "Frazer Frost") issued "clean" or unqualified opinions on RINO's financial statements for fiscal years 2008 and 2009, stating that those financial statements were presented in accordance with GAAP based on Frazer Frost's audits which were performed in accordance with GAAS.  GAAS, as approved and adopted by the AICPA, governs the conduct of audit engagements.  In fact, the audit reports were false and misleading due to, among other things, Frazer Frost's failure to conduct the audits in accordance with GAAS, and the fact that RINO's financial statements issued for fiscal years 2008 and 2009

1  were not prepared in conformity with GAAP.  Frazer Frost's reports were therefore in violation

2  of GAAS, GAAP and SEC rules.

3    168. The objective of audits of financial statements by the independent auditor is the

4  expression of an opinion on the fairness with which they present, in all material respects,

5  financial position, results of operations and cash flows in conformity with GAAP.  The

6  auditor's report is the medium through which he expresses his opinion or, if circumstances

7  require, disclaims an opinion.  In either case, he states his audit has been in accordance with

8  GAAS.  These standards require him to state whether, in his opinion, the financial statements

9  are presented in accordance with GAAP and to identify those circumstances in which such

10  principles have not been consistently observed in the preparation of the financial statements of

11  the current period in relation to those of the preceding period.  AU §110.01.

12    169. GAAS as approved and adopted by the membership of the AICPA, are

13  comprised of 10 general standards.  These standards to a great extent are interrelated and

14  interdependent.  The independent auditor is responsible for compliance with GAAS in an audit

15  engagement.  The 10 general standards are as follows:

16

17           **General Standards**

18     • The audit is to be performed by a person or persons having adequate

19  technical training and proficiency as an auditor.

20     • In all matters relating to the assignment, independence in mental attitude

21  is to be maintained by the auditor or auditors.

22     • Due professional care is to be exercised in the performance of the audit

23  and the preparation of the report.

24          **Standards of Fieldwork**

25     • The work is to be adequately planned and assistants, if any, are to be

26  properly supervised.

27

28

- A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed.

- Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

**Standards of Reporting**

- The report shall state whether the financial statements are presented in accordance with GAAP.

- The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

- Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

- The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefore should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

170.   Frazer Frost's audits of RINO's financial statements issued between 2008 and 2009 violated each of the general standards.

171.   Frazer Frost is one of the largest international firms of certified public accountants. Frazer Frost was the auditor of RINO's financial statements between 2008 and the present. In addition, they were paid to review the quarterly financial statements of RINO throughout this period. Frazer Frost audited RINO's financial statements issued between 2008 and the present, and issued their audit opinions stating that those financial statements were fairly presented in accordance with GAAP, and that they had

audited those financial statements in accordance with GAAS. Both of those statements were false. Frazer Frost either knew or should have been aware of facts that undeniably precluded them from making those statements at the time they were made. RINO's financial statements and Frazer Frost's opinions on them were then used by RINO with Frazer Frost's consent to publicly disseminate RINO's financial results in the filing of their annual Forms 10-K with the SEC.

172.    Frazer Frost was negligent in failing to comply with GAAS as RINO's independent accountant. RINO issued unqualified opinions stating that the financial statements of RINO were fairly presented in accordance with GAAP, when they were aware of or should have been aware of facts and circumstances that undermined such unqualified opinions and rendered them false and misleading.

173.    In the course of performing their audit services, Frazer Frost reasonably could have obtained evidential matter revealing the adverse facts detailed above about RINO's undisclosed compensation, but improperly failed to require them to adjust their financial statements or make disclosure of such facts. As a result of their investigations and audit work, Frazer Frost reasonably should have known that the reports and financial statements described herein were materially misleading or negligently disregarded facts that showed that all such statements were materially misleading.

174.    Because: (a) Frazer Frost spoke regularly with RINO Board and Audit Committee members who were knowledgeable about the undisclosed option practices; and (b) Frazer Frost attended certain of Board and Audit Committee meetings where legal compliance was discussed, Frazer Frost knew or negligently disregarded facts that indicated that they should have: (i) qualified their opinions on RINO's financial statements for fiscal years 2008 and 2009; or (ii) required the Company to adjust its financial statements; or (iii) refused to give opinions in light of the materially adverse effects of the undisclosed facts about RINO's financial condition. The failure to make such qualification, correction, modification or withdrawal was a violation of GAAS, including the Fourth Standard of Reporting.

175.     Frazer Frost failed to require RINO to disclose material adverse facts and allowed the Company to make material misrepresentations to their shareholders and to the investing public.

176.     Frazer Frost violated GAAS General Standard No. 3, which requires that due professional care must be exercised by the auditor in performance of the examination and the preparation of the audit report.

177.     Frazer Frost violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.  Frazer Frost reasonably should have known that RINO's internal controls were insufficient yet still failed to expand their auditing procedures.

178.     Frazer Frost violated GAAS Standard of Field Work No. 3, which requires sufficient competent evidential matter be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion to be issued on the subject financial statements.  As described above, Frazer Frost failed to obtain sufficient competent evidential matter as to RINO's accounting and disclosure practices.

179.     Frazer Frost violated GAAS Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP.  Frazer Frost's opinions falsely represented that RINO's financial statements complied with GAAP, when Frazer Frost knew or negligently disregarded that they did not for the reasons herein alleged.

180.     Frazer Frost violated GAAS Standard of Reporting No. 4, which requires, when an opinion on the financial statements as a whole cannot be expressed, that the reasons be stated.  Frazer Frost should have either stated that no opinion could be issued by them on RINO's financial statements or issued an adverse opinion stating that the financial statements were not fairly presented.

181.     Frazer Frost violated Standard of Field Work No. 1 and the standards set forth in AU §§310, 320 and 327 by, among other things, failing to adequately plan their audit and properly supervise the work of their assistants so as to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

182.     Frazer Frost violated SAS No. 16 in that they failed to perform their examination with an attitude of professional skepticism and, in connection with the audits of RINO's financials, ignored numerous "red flags" that would reasonably have led to the discovery of the Individual Defendants' overstatement of RINO's earnings.

183.     Frazer Frost violated AU §316.20, which requires that additional procedures should be performed when evaluation at the financial-statement level indicates significant risk.

184.     As a result of the foregoing, Frazer Frost's certification of RINO's financial statements for fiscal years 2008 and 2009 falsely represented that the statements were audited pursuant to GAAS and that RINO's financial statements were presented in conformity with GAAP.   Frazer Frost knew that such certification was false and misleading because, as detailed herein: (a) Frazer Frost knew or were negligent in not knowing that the Company's financial statements violated GAAP; and (b) Frazer Frost knew they had not complied with GAAS.

185.     As a result of the services rendered to RINO, Frazer Frost's personnel were present or should have been present at RINO's corporate headquarters and major operating offices and examined or participated, or should have examined and participated, in reviews, investigations and audit procedures regarding the financial condition, business operations and financial, accounting and management-control systems of RINO. In the course of performing such services, Frazer Frost had virtually unlimited access to substantial evidential matter revealing the adverse facts about the Company's compliance with finance reporting requirements and laws and the finances of RINO, but improperly failed to require adjustment for or disclosure of such facts.

186.    Frazer Frost: (a) knew or were negligent in not knowing of the material, adverse, non-public information about the financial statements of RINO, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about RINO pleaded herein, involving the SEC reports on Form 10-K.

187.    In performing auditing and accounting services on behalf of RINO and engaging in the wrongful acts alleged herein, Frazer Frost knew or should have known that their clients would, and did, transmit false and misleading financial information to the investing public.    However, Frazer Frost failed to discharge their duties in adherence to GAAP and GAAS to detect errors and irregularities.

188.    In performing the auditing and accounting services to RINO in the manner alleged herein, Frazer Frost owed a duty to RINO and their shareholders to use such skill, care and diligence as other members of its profession commonly exercised. Frazer Frost, however, breached such duty by committing the wrongful acts and conduct alleged herein.

189.    RINO relied to their detriment on Frazer Frost and was damaged thereby.

190.    As a direct, foreseeable and proximate result of Frazer Frost's breach of duties owed to RINO, it was damaged.

## SEVENTH CAUSE OF ACTION

### Derivative Claim Against Defendants Moore Stephens Wurth Frazer and Torbet, LLP and Frazer Frost LLP for Breach of Contract

191.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

192.    At times relevant hereto, Moore Stephens Wurth Frazer and Torbet, LLP and Frazer Frost LLP (collectively referred to herein as "Frazer Frost") and RINO were parties to written contracts pursuant to which Frazer Frost agreed to provide audit services to RINO in accordance with GAAS.

193.     Frazer Frost breached its contracts with RINO by, among other things, failing to render services in accordance with GAAS and preparing and/or approving financial statements that were not prepared in accordance with GAAP.

194.     As a direct and proximate result of Frazer Frost's breaches of contract, RINO has sustained damages, as alleged herein.

## EIGHTH CAUSE OF ACTION

### Derivative Claim Against Defendants Moore Stephens Wurth Frazer and Torbet, LLP and Frazer Frost LLP for Aiding and Abetting Breaches of Fiduciary Duty

195.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

196.     Defendants Moore Stephens Wurth Frazer and Torbet, LLP and Frazer Frost LLP (collectively referred to herein as "Frazer Frost") aided and abetted the Individual Defendants in breaching their fiduciary obligations owed to RINO resulting in the wrongdoing and damages to the Company.  Frazer Frost knew or should have known that RINO's financial statements for fiscal years 2008 and 2009 were materially false and misleading.  Frazer Frost also knew, or should have known, that the false and misleading information would be used, in whole or in part, by RINO to prepare their publicly reported financial results and financial statements.  Nevertheless, Frazer Frost actively prepared the false and misleading information and thereby aided and abetted defendants' breaches of fiduciary duty and their abuse of control, gross mismanagement and violation of their duty of candor to RINO shareholders, complained of herein.

197.     As a direct, foreseeable and proximate result of Frazer Frost's aiding and abetting of defendants' breaches of fiduciary duty, RINO has been damaged.

## IX.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A. Declaring that this action is properly maintainable as a shareholder derivative action;

B. Declaring and decreeing that the Individual Defendants are in breach of the fiduciary duties owed to RINO's public shareholders;

C. Declaring and decreeing that the Individual Defendants have wasted corporate assets, engaged in gross mismanagement, and abused their positions of control at the Company;

D. Declaring and decreeing that the Individual Defendants have unjustly enriched themselves;

E. Declaring and decreeing that Frazer Frost LLP has committed professional auditor malpractice and aided and abetted the breaches of fiduciary duty committed by the Individual Defendants;

F. Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

G. Directing RINO to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect RINO and its shareholders from a reoccurrence of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

    1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2.    a provision to permit the shareholders of RINO to nominate at least two candidates for election to the Board;

    3.    a proposal to ensure the accuracy of the qualifications of RINO's directors, executives and other employees;

    4.    a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

5.   appropriately test and then strengthen the internal audit and control functions.

E.   Granting such other and further equitable relief as this Court may deem just and proper.

**X.   JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable.

**AFFIRMATION**

(Pursuant to NRS 239B.030)

The undersigned does hereby affirm that the preceding document filed in the above referenced matter does not contain the social security number of any person.

Dated: August 2, 2011                    THE O'MARA LAW FIRM, P.C.

David C. O'Mara
William M. O'Mara
311 E. Liberty Street
Reno, NV 89501
Telephone: (775) 323-1321
Fax: (775) 323-4082

*Liaison Counsel for Plaintiffs*

CHAPIN FITZGERALD
  SULLIVAN & BOTTINI, LLP
Francis A. Bottini, Jr. (*pro hac vice*)
Albert Y. Chang
550 West "C" Street, Suite 2000
San Diego, CA  92101
Telephone:  (619) 241-4810
Fax:  (619) 955-5318

SARRAF GENTILE LLP
Ronen Sarraf
Joseph Gentile
One Pennsylvania Plaza
New York, New York 10119
Tel.: (212) 868-3610
Fax: (212) 918-7967

*Lead Counsel for Plaintiffs*

VIANALE & VIANALE LLP
Kenneth J. Vianale
2499 Glades Road, Suite 112

55

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Boca Raton, Florida 33431
T: 561-392-4750
F: 561-392-4775

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify under penalties of perjury that on this date I served a true and correct copy of the foregoing document by:

| | | |
|---|---|---|
| X | Depositing for mailing, in a sealed envelope, U.S. Postage prepaid, at Reno, Nevada | Feder, Dwyer |
| X | Personal delivery | Lundvall |
| ____ | Facsimile | |
| ____ | Messenger Service | |
| ____ | Federal Express or other overnight delivery | |

addressed as follows:

GORDERN SILVER
Michael N. Feder
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169

COOLEY LLP
John C. Dwyer
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306

Pat Lundvall
100 West Liberty Street, 10th Floor
Reno, Nevada 89501
(775) 788-2020

DATED: August 3, 2011

Aug. 2. 2011 11:15AM   Union Tank Car Co.                         No. 0352   P. 1

## VERIFICATION

I, Richard Elipani, hereby verify that I am a shareholder of RINO International Corporation ("RINO"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct.  I have reviewed the allegations made in this Verified First Amended Consolidated Derivative Complaint and to those allegations of which I have personal knowledge believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.  Having received a copy of this Verified First Amended Consolidated Derivative Complaint, having reviewed it with counsel, I hereby authorize its filing.

Date: _August 2, 2011_        _____

                            Mr. Richard Elipani

- 1 -

08/02/2011 11:42 FAX 5614995139          SeniorFinancialServices                    @001/001

## VERIFICATION

I, Norman Miller, hereby verify that I am a shareholder of RINO International Corporation ("RINO"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified First Amended Consolidated Derivative Complaint and to those allegations of which I have personal knowledge believe those allegations to be true  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.  Having received a copy of this Verified First Amended Consolidated Derivative Complaint, having reviewed it with counsel, I hereby authorize its filing.

Date: __8/3/11__                              _____
                                              Mr. Norman Miller

- 1 -